**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BRIAN BICKETT and ROBERT BAZINET, derivatively on behalf of BROOKDALE SENIOR LIVING  INC., <br><br>          Plaintiffs, <br><br>     v. <br><br> LUCINDA M. BAIER, T. ANDREW SMITH, STEVEN E. SWAIN, MARCUS E. BROMLEY, FRANK M. BUMSTEAD, JACKIE M. CLEGG, DANIEL A. DECKER, RITA JOHNSON-MILLS, JEFFREY R. LEEDS, MARK J. PARRELL, WILLIAM G. PETTY, JR., GUY P. SANSONE, JAMES R. SEWARD, DENISE W. WARREN, and LEE S. WIELANSKY, <br><br>          Defendants, <br><br>    and <br><br> BROOKDALE SENIOR LIVING INC., <br><br>          Nominal Defendant. | **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** <br><br> DEMAND FOR JURY TRIAL <br><br> Case No. |

Plaintiffs Brian Bickett and Robert Bazinet ("Plaintiffs"), by Plaintiffs' undersigned attorneys, derivatively and on behalf of Nominal Defendant Brookdale Senior Living Inc. ("Brookdale" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Lucinda M. Baier ("Baier"), T. Andrew Smith ("Smith"), Steven E. Swain ("Swain"), Marcus E. Bromley ("Bromley"), Frank M. Bumstead ("Bumstead"), Jackie M. Clegg ("Clegg"), Daniel A. Decker ("Decker"), Rita Johnson-Mills ("Johnson-Mills"), Jeffrey R. Leeds ("Leeds"), Mark J. Parrell ("Parrell"), William  G.  Petty,  Jr.  ("Petty"),  Guy  P.  Sansone ("Sansone"),  James  R.  Seward ("Seward"), Denise W. Warren ("Warren"), and Lee S. Wielansky

("Wielansky") (collectively, the "Individual Defendants," and together with Brookdale the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Brookdale, unjust enrichment, waste of corporate assets, abuse of control, and gross mismanagement, and violations of Sections 10(b), and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiffs' complaint against the Individual Defendants, Plaintiffs allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Brookdale, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Brookdale's directors and officer from August 10, 2016 through April 29, 2020, both dates inclusive (the "Relevant Period").

2.      Since Brookdale's founding in 2005, it has become the largest operator of senior living communities based on total capacity in the United States. As of February 2, 2020, Brookdale has 743 communities in 45 states and the ability to serve approximately 65,000 residents. The Company owns, leases, and manages independent living, assisted living, memory care, and continuing care retirement communities. Brookdale's range of services includes home health, hospice, and outpatient therapy services.

3.      Brookdale determines the level of care each of its residents needs through an initial evaluation, which, in turn, determines how much the Company charges each resident for its services under the Company's standard, uniform Residency Agreements (the "Residency Agreements"). The more care required by a resident, the more expensive Brookdale's monthly fee will be, the increase in costs supposedly due to increasing personnel needs.

4.      From Brookdale's inception, the Company pursued an aggressive growth strategy through a number of acquisitions which have required substantial financing. As a result of the Company's significant debt and lease obligations, the Company was required to set and meet certain financial performance thresholds for Brookdale and all of its facilities throughout the United States. Moreover, those obligations are subject to cross-default and cross-collateralization provisions, which means that a default by Brookdale related to one facility could have a significant effect on a sizeable portion of the Company's community portfolio.

5.      Due to the pressure for each Brookdale facility to satisfy those financial performance targets and avoid default under its extensive debt and lease obligations, the Company operates as a single entity. The Company closely monitors and asserts tight-knit control over each aspect of the operations of every Brookdale managed facility in the United States. As a result, the Company is almost completely, and exclusively, managed out of its headquarters based in Brentwood, Tennessee.

6.      One mechanism of the Company's centralized control of all Brookdale operations was the utilization of a computer software program called the Service Alignment Software (the "Service Alignment Software"). The Service Alignment Software was developed in-house by Brookdale in order to determine and regulate the Company's daily staffing needs at its facilities – Brookdale's largest line-item expense.

7.      The Service Alignment Software required that individuals enter certain data such as task counts, task times, logic algorithms, and source code. The Individual Defendants, in order to guarantee rigorous compliance with Company policies, specifically with regard to facility staffing needs, ensured that facility-level employees did not have access to the Service Alignment Software and could not otherwise adjust staffing at Brookdale facilities.

8.      Throughout the Relevant Period the Individual Defendants caused the Company to: (i) intentionally underestimate the data inputs that were entered into the Service Alignment Software in a concerted effort to meet certain financial performance targets; (ii) as a result, systematically and purposefully set daily staffing numbers and hours at Brookdale facilities greatly beneath the staffing levels necessary to meet resident needs and the demand for care in Brookdale facilities, in accordance with their Personal Service Assessment (defined below); (iii) fail to permit the facility-level employees to adjust data inputs to the Service Alignment Software or facility staffing levels based upon known facility staffing needs; (iv) as a result of the foregoing, fail to provide prompt care and services to residents that had been paid for; (v) as a result of the foregoing, breach Brookdale's standard form Residency Agreements; (vi) as a result of the foregoing, violate state adult care home rules and regulations (collectively, the " Manipulation Scheme").

9.      In breach of their fiduciary duties, the Individual Defendants permitted the Manipulation Scheme, engaged and caused the Company to engage in the  Manipulation Scheme, and failed to maintain adequate controls.

10.     Nonetheless, throughout the Relevant Period, several of the Company's annual and quarterly financial reports filed with the SEC on Forms 10-K and 10-Q failed to disclose the Manipulation Scheme and therefore contained serious errors that rendered them unreliable.

Nevertheless, the Company's SEC filings issued throughout the Relevant Period maintained, *inter alia*, that Brookdale maintained adequate control over its financial reporting.

11.    On May 3, 2019, a lawsuit was filed against Brookdale, captioned *Bright, et al. v. Brookdale Senior Living Inc.*, No. 3:19-cv-00374-WLC-BDH (M.D. Tenn. 2019) (the "Bright Action") seeking, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations. On April 24, 2020, another lawsuit was filed against Brookdale seeking substantially similar relief as sought in the Bright Action, captioned *Gunza, et al. v. Brookdale Senior Living Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn. 2020) (the "Gunza Action," and together with the Bright Action, the "Consumer Class Action").

12.    On April 30, 2020, *Nashville Business Journal* published an article (the "April 2020 Article") which reported on the Gunza Action filed against the Company alleging that the Company had used computer software to "underestimate" staffing needs at each of its facilities to intentionally "chronically" understaff its facilities in North Carolina to satisfy financial performance targets and mislead Brookdale residents and their families by failing to provide "basic care" and "daily living services" that were paid for. The April 2020 Article further revealed that the Company's officers "routinely" scolded executive directors in emails related to staffing budgets. Finally, the April 2020 Article revealed that the Company had established lucrative incentive programs that  were connected to satisfying or  surpassing the Company's financial performance targets to induce employees to keep staffing expenses within budget regardless of need.

13.     On this news, the Company's share price closed on May 1, 2020 at $3.12 per share, a $0.56 drop, or approximately 15.22%, from its closing price of $3.68 per share on April 29, 2020, wiping approximately $100 million in the Company's market capitalization.

14.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make a series of materially false and misleading statements regarding the Company's business, operations, prospects and legal compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Manipulation Scheme; (2) the Company's commercial success was maintained by, among other things, the  Manipulation Scheme; (3) the Manipulation Scheme exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Manipulation Scheme would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

15.     The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public. During the Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

16.     Furthermore, during the  Relevant Period, the  Individual  Defendants breached their fiduciary duties by causing the Company to repurchase its own stock at prices that were

artificially inflated due to the foregoing misrepresentations. Nearly 10.1 million shares of the Company's common stock were repurchased between September 2016 and March 2020 for nearly $72.5 million. As the Company stock was actually only worth $3.12 per share, the low price it reached during trading on May 1, 2020, the Company overpaid nearly $41.1 million in total.

17.    As a result of the Individual Defendants' Manipulation Scheme, which has subjected Brookdale, to being named as a defendant in the Consumer Class Action lawsuit pending in the United States District Court for the Middle District of Tennessee and to being named, along with the Company's Chief Executive Officer ("CEO"), its former CEO, its Chief Financial Officer ("CFO"), as defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Middle District of Tennessee captioned Posey v. Brookdale Senior Living Inc., et al., Case No. 3:20-cv-00543 (M.D. Tenn.) (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

18.    In light of the breaches of fiduciary duty engaged in by the Individual Defendants, many of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and the CEO's, CFO's and former CEO's liability in the Securities Class Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Brookdale's Board of Directors (the "Board") cannot

consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDATION AND VENUE

19.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

20.     This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

21.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

22.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiffs and Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

23.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because the Nominal Defendant is incorporated in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in

this District and Brookdale and the Individual Defendants have conducted business in this District and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

25.     Plaintiff Brian Bickett ("Bickett") is a current shareholder of Brookdale common stock and has held Brookdale common stock since 2005. Bickett is a citizen of Florida.

26.     Plaintiff Robert Bazinet ("Bazinet") is a current shareholder of Brookdale common stock and has held Brookdale common stock since 2015. Bazinet is a citizen of Minnesota.

### Nominal Defendant Brookdale

27.     Nominal Defendant Brookdale is a Delaware corporation. Brookdale's principle executive offices are located at 111 Westwood Place, Suite 400, Brentwood, Tennessee  37027. Brookdale stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol ("BKD").

### Defendant Baier

28.     Defendant Baier has served as Brookdale's President and CEO and as a Company director since February 2018. Director Baier previously served as Brookdale's CFO from December 2015 until February 2018. According to the Company's public filings, as of May 11, 2020, Defendant Baier beneficially owned 252,254 shares of the Company's common stock which represents less than 1% of the Company's outstanding shares of common stock as of that date. The closing price per share of the Company's common stock at the close of trading on May 11, 2020, was $2.95, accordingly, Baier owned over $743,854 worth of Brookdale stock as of that date.

29.     Brookdale paid Defendant Baier the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2016 | $552,115 | - | $1,500,005 | $222,750 | $217,497 | $2,492,367 |
| 2017 | $550,000 | - | $1,500,013 | $196,150 | $161,025 | $2,407,188 |
| 2018 | $782,248 | $50,000 | $3,551,872 | $281,023 | $9,112 | $4,674,255 |
| 2019 | $910,000 | - | $4,773,420 | $657,295 | $10,186 | $6,350,901 |

30.     Upon information and belief, Defendant Baier is a citizen of Tennessee.

**Defendant Smith**

31.     Defendant Smith served as the Company's CEO since February 2013, as President since March 2016, and as a Company director since June 2014. On February 28, 2018, Defendant Smith resigned from all of his positions with the Company. Defendant Smith previously served as the Company's Executive Vice President, General Counsel, and Secretary from October 2006 until February 2013.

32.     Brookdale paid Defendant Smith the following compensation as an executive:

| Fiscal Year | Salary | Stock Awards | Non-Equity Incentive Plan | All Other Compensation | Total |
|---|---|---|---|---|---|
| 2016 | $953,654 | $5,225,007 | $418,594 | $11,339 | $6,608594 |
| 2017 | $950,000 | - | $356,709 | $9,120 | $1,315,829 |
| 2018 | $157,115 | - | - | $2,552,199 | $2,709,314 |

33.     Upon information and belief, Defendant Smith is a citizen of Tennessee.

**Defendant Swain**

34.     Defendant Swain has served as the Company's CFO since September 2018. According to the Company's public filings, as of May 11, 2020, Defendant Swain beneficially owned 22,659 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. The price per share of the

Company's common stock at the close of trading on May 11, 2020, was $2.95, accordingly, Swain

owned over $66,844 worth of Brookdale stock as of that date.

35.     Brookdale paid Swain the following compensation as an executive:

| Fiscal Year | Salary | Bonus | Stock Awards | Non-Equity Incentive Plan | All Other Compensation | Total |
|---|---|---|---|---|---|---|
| 2018 | $161,538 | $100,000 | $802,324 | $46,038 | $162,235 | $1,272,135 |
| 2019 | $515,000 | - | $1,306,414 | $275,545 | $20,490 | $2,117,449 |

36.     Upon information and belief, Defendant Swain is a citizen of Colorado.

**Defendant Bromley**

37.     Defendant Bromley has served as a director of the Company, acting as a member

of both the Board's Audit Committee and Investment Committee, since July 2017. According to

the Company's public filings, as of May 11, 2020, Defendant Bromley beneficially owned 75,171

shares of the Company's common stock which represented less than 1% of the Company's

outstanding shares of common stock as of that date. The price per share of the Company's common

stock as of close on May 11, 2020, was $2.95, accordingly, Bromley owned over $221,754 worth

of Brookdale stock as of that date.

38.     Brookdale paid Bromley the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2017 | - | - | $203,472 |
| 2018 | $187,000 | $43,831 | $230,831 |
| 2019 | $157,000 | $99,995 | $256,995 |

39.     Upon information and belief, Defendant Bromley is a citizen of Georgia.

**Defendant Bumstead**

40.     Defendant Bumstead has served as a director of the Company, acting as the chair of the Board's Compensation Committee and as a member of the Nominating and Corporate Governance Committee, since August 2006. According to the Company's public filings, as of May 11, 2020, Defendant Bumstead beneficially owned 300,224 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. The price per share of the Company's common stock at the close of trading on May 11, 2020, was $2.95, accordingly, Defendant Bumstead owned over 885,660 worth of Brookdale stock as of that date.

41.     Brookdale paid Defendant Bumstead the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2016 | $221,000 | $99,995 | $322,995 |
| 2017 | $280,000 | $99,992 | $379,992 |
| 2018 | $216,000 | $99,994 | $315,994 |
| 2019 | $190,000 | $99,995 | $289,995 |

42.     Upon information and belief, Defendant Bumstead is a citizen of Tennessee.

**Defendant Clegg**

43.     Defendant Clegg served as a director of the Company, acting as the Chair of the Board's Nominating and Corporate Governance Committee and as a member of the Compensation Committee and the Audit Committee, from November 2005 until October 29, 2019.

44.     Brookdale paid Defendant Clegg the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2016 | $240,000 | $99,995 | $339,995 |
| 2017 | $291,000 | $99,992 | $390,992 |
| 2018 | $223,000 | $99,994 | $322,994 |
| 2019 | $249,052 | $99,995 | $349,047 |

45.      Upon information and belief, Defendant Clegg is a citizen of Washington, D.C.

**Defendant Decker**

46.      Defendant Decker served as the Executive Chairman of the Board from November 2016 until his resignation became effective on March 1, 2018. Previously, he served as the Non-Executive Chairman of the Board from October 2015 until October 31, 2016. During his time on the Board, he served on the Board's Investment Committee.

47.      Brookdale paid Defendant Decker the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2016 | $479,167 | $591,313 | $11,685 | $1,082,164 |
| 2017 | $687,500 | - | $18,466 | $705,966 |
| 2018 | $138,077 | $80,047 | $3,532 | $221,656 |

48.      Upon information and belief, Defendant Decker is a citizen of California.

**Defendant Johnson-Mills**

49.      Defendant Johnson-Mills has served as a Company director, acting as the Chair of the Nominating and Corporate Governance Committee as well as a member of the Investment Committee, since August 2018. According to the Company's public filings, as of May 11, 2020, defendant Johnson-Mills beneficially owned 41,907 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. The price per share of the Company's common stock at the close of trading on May 11, 2020,

was $2.95, accordingly, Defendant Johnson-Mills owned over $123,625 worth of Brookdale stock as of that date.

50.     Brookdale paid Defendant Johnson-Mills the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2018 | $55,033 | $99,991 | $155,024 |
| 2019 | $170,609 | $41,367 | $211,976 |

51.     Upon information and belief, Defendant Johnson-Mills is a citizen of Tennessee.

**<u>Defendant Leeds</u>**

52.     Defendant Leeds served as a director of the Company, acting as a member of the Compensation Committee, as a member of the Audit Committee, and as a member of the Nominating and Corporate Governance Committee, from November 2005 until his resignation became effective on October 5, 2018. He also served as the Non-Executive Chairman of the Board from June 2012 until September 2015.

53.     Brookdale paid Defendant Leeds the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2017 | $274,000 | $99,992 | $373,992 |
| 2018 | $173,087 | $99,994 | $273,081 |

54.     Upon information and belief, Defendant Leeds is a citizen of New York.

**Defendant Parrell**

55.      Defendant Parrell served as a director of the Company, where he also served as a member of the Audit Committee and Investment Committee, from April 2015 until his resignation effective July 24, 2017, at the Company's annual meeting.

56.      Brookdale paid Defendant Parrell the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2016 | $190,000 | $69,306 | $259,306 |
| 2017 | $113,522 | $99,992 | $213,514 |

57.      Upon information and belief, Defendant Parrell is a citizen of Illinois.

**Defendant Petty**

58.      Defendant Petty served as a director of the Company beginning December 2014, where he also served as a member of the Investment Committee and as a member of the Nominating and Corporate Governance Committee, from December 2014 until his resignation effective February 21, 2018.

59.      Brookdale paid Defendant Petty the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2016 | $209,000 | $99,995 | $308,995 |
| 2017 | $115,000 | $99,992 | $214,992 |
| 2018 | $15,899 | $99,994 | $115,883 |

60.      Upon information and belief, Defendant Petty is a citizen of Illinois.

**Defendant Sansone**

61.      Defendant Sansone has served as a director of the Company since October 2019 and as Non-Executive Chairman of the Board since January 2020. According to the Company's

public filings, as of May 11, 2020, Defendant Sansone owned 2,491 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. At the close of trading on May 11, 2020, the price per share of the Company's common stock was $2.95, therefore, Sansone owned over $7,348 worth of Brookdale stock as of that date.

62.     Brookdale paid Defendant Sansone the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2019 | $20,391 | $99,996 | $120,387 |

63.     Upon information and belief, Defendant Sansone is a citizen of South Carolina.

**Defendant Seward**

64.     Defendant Seward served as a director of the Company, where he also served as a member of the Audit Committee, from November 2008 until his resignation became effective on October 29, 2019.

65.     Brookdale paid Defendant Seward the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2016 | $210,000 | $99,995 | $309,995 |
| 2017 | $99,992 | $267,167 | $367,159 |
| 2018 | $226,167 | $99,994 | $326,161 |
| 2019 | $227,408 | $99,995 | $327,403 |

66.     Upon information and belief, Defendant Seward is a citizen of Kansas.

**Defendant Warren**

67.     Defendant Warren has served as a director of the Company, where she serves as the Chair of the Audit Committee and as a member of the Compensation Committee, since October

2018. According to the Company's public filings, as of May 11, 2020, Defendant Warren beneficially owned 48,606 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. At the close of trading on May 11, 2020, the price per share of the Company's common stock was $2.95, therefore, Warren owned over $143,387 worth of Brookdale stock as of that date.

68.     Brookdale paid Defendant Warren the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2018 | $32,185 | $99,996 | $132,181 |
| 2019 | $172,500 | $24,382 | $196,882 |

69.     Upon information and belief, Defendant Warren is a citizen of North Carolina.

**<u>Defendant Wielansky</u>**

70.     Defendant Wielansky has served as a director of the Company, where he also serves as the Chair of the Investment Committee and as a member of the Audit Committee, since April 2015. He also served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019, and served as a member of the Compensation Committee. According to the Company's public filings, as of May 11, 2020, Defendant Wielansky beneficially owned 101,338 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. At the close of trading on May 11, 2020, the price per share of the Company's common stock was $2.95, therefore, Warren owned over $298,947 worth of Brookdale stock as of that date.

71.     Brookdale paid Defendant Wielansky the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2016 | $205,000 | $69,306 | $274,306 |
| 2017 | $262,000 | $99,992 | $361,992 |
| 2018 | $453,583 | $99,994 | $553,577 |
| 2019 | $406,609 | $99,995 | $506,604 |

72.     Upon information and belief, Defendant Wielansky is a citizen of Missouri.

**Non-Party Freed**

73.     Non-Party Victoria L. Freed ("Freed") has served as a Company director, where she serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee, since October 2019. According to the Company's public filings, as of May 11, 2020, Freed beneficially owned 2,491 shares of the Company's common stock which represented less than 1% of the Company's outstanding shares of common stock as of that date. At the close of trading on May 11, 2020, the price per share of the Company's common stock was $2.95, therefore, Freed owned over $7,348 worth of Brookdale stock as of that date.

74.     Brookdale paid Freed the following compensation as a director:

| Fiscal Year | Fees Earned and Cash Paid | Stock Awards | Total |
|---|---|---|---|
| 2019 | $24,931 | $99,996 | $124,387 |

**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**

75.     By reason of their positions as officers, directors and/or fiduciaries of Brookdale and because of their ability to control the business and corporate affairs of Brookdale, the Individual Defendants owed Brookdale and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and

manage Brookdale in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Brookdale and its shareholders, so as to benefit all shareholders equally.

76.     Each director and officer of the Company owes to Brookdale and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

77.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Brookdale, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

78.     To discharge their duties, the officers and directors of Brookdale were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

79.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Brookdale, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Brookdale's Board at all relevant times.

80.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, so that the market price of the Company's common stock would be based upon truthful and accurate information.

81.     To discharge their duties, the officers and directors of Brookdale were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Brookdale were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Tennessee, and the United States, and pursuant to Brookdale's own internal guidelines, including its Code of Business Conduct and Ethics (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Brookdale conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)      establish and maintain systematic and accurate records and reports of the business and internal affairs of Brookdale and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Brookdale's operations would comply with all laws and Brookdale's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company;

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above; and

(i)      conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock.

82.      Each of the Individual Defendants further owed to Brookdale and the shareholders the duty of loyalty requiring that each favor Brookdale's interest and that of its

shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

83.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Brookdale and were at all times acting within the course and scope of such agency.

84.     Because of their advisory, executive, managerial, and directorial positions with Brookdale, each of the Individual Defendants had access to adverse, non-public information about the Company.

85.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Brookdale.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

86.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

87.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and for contribution under Sections 10(b) and 21D of the Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) to artificially inflate the Company's stock price while the Company repurchased its own stock.

88.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or negligently to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who are directors of Brookdale was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

89.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

90.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Brookdale, and was at all times acting within the course and scope of such agency.

## BROOKDALE'S CODE OF CONDUCT

91.     The Code of Conduct states that its purpose is to "serve as a guide in doing [our] jobs the way they should be done - according to the highest ethical and professional standards and in accordance with applicable laws and regulations."

92.     In the section titled, "Associates, Conflicts of Interest, Corporate Opportunities and Gifts," the Code of Conduct states that:

> Brookdale associates, officers and directors are expected to dedicate their best efforts to advancing Brookdale's interests and to make decisions that affect Brookdale based on the Company's best interests, independent of outside

influences. Except as provided in Article Eight of the Company's Amended and Restated Certificate of Incorporation, every associate, officer and director must avoid any situation that conflicts or appears to conflict with the interests of Brookdale. A conflict of interest can arise when an associate or a related party can personally benefit or profit from a transaction involving Brookdale and the associate or related party, or where an associate's personal interests influence or appear to influence his or her ability to make objective decisions in the course of performing his or her job duties.

*     *     *

Special rules apply to executive officers and directors who engage in conduct that creates an actual, apparent or potential conflict of interest. Before engaging in any such conduct, executive officers and directors must make full disclosure of all facts and circumstances to the General Counsel, who shall inform and seek the prior approval of the Audit Committee of the Board of Directors.

93.     In the section titled "Health Care," the Code of Conduct states, in pertinent part, that:

Brookdale intends to comply with state and federal laws relating to health care providers and to ensure that associates and agents of Brookdale comply with these laws. Brookdale endeavors to follow the highest standards of ethics, honesty and integrity in conducting transactions and relationships with physicians, insurers, clients, state and federal government agencies and any other health care related entities. Associates whose responsibilities include providing resident care should receive annual training regarding these health care standards.

94.     In the section titled "Finance and Business Matters," the Code of Conduct states, in pertinent part, that:

In compliance with the Sarbanes-Oxley Act of 2002 and related Securities and Exchange Commission ("SEC") regulations, the Company has established a written Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"). Amendments to or implicit or explicit waivers of the Code of Ethics will be disclosed as required by SEC rules. The Code of Ethics has been designed to deter wrongdoing and to promote honest and ethical conduct, including the ethical handling of any actual or apparent conflicts of interest; full, fair, accurate, timely and understandable disclosure in Brookdale's SEC filings and submissions, as well as other public communications by the Company; compliance with applicable laws, rules and regulations; and prompt reporting of any violations or suspected violations of the Code of Ethics or applicable law. To the extent of any inconsistency between the terms of this Code and the Code of Ethics, the requirements of the Sarbanes-Oxley Act shall control.

\*      \*      \*

**Marketing and Advertising**

Advertising and marketing materials need to conform to state and federal laws and regulations regarding these activities. Brookdale advertising should be truthful and not misleading. Specific claims about the quality of Brookdale's services should be supportable. Price advertising should accurately reflect the true charge for services provided to residents.

Brookdale will not use advertisements or marketing programs that might cause confusion between Brookdale's services and those of our competitors. Brookdale will not disparage the service or business of a competitor through the use of false or misleading representations.

\*      \*      \*

**Fair Dealing**

Brookdale depends on its reputation for quality, service and integrity. The way we deal with our residents, competitors and suppliers molds our reputation, builds long-term trust and ultimately determines our success. Associates, officers and directors should endeavor to deal fairly with Brookdale's residents, competitors, suppliers and associates. We must never take unfair advantage of others through manipulation, concealment, abuse of privileged information, misrepresentation of material facts or any other unfair-dealing practice.

95.    In the section titled "Information, Records and Company Assets," the Code of

Conduct states, in pertinent part, that:

**Complaints and Concerns Regarding Accounting Matters**
Brookdale is committed to compliance with applicable securities and other laws, rules and regulations, accounting standards and internal accounting controls. It is the responsibility of every Brookdale associate to promptly report complaints or concerns regarding accounting, internal accounting controls and auditing matters. Associates may report suspected misconduct, including such concerns or complaints, on a confidential or anonymous basis by the calling the Brookdale Integrity Line. No one will be subject to retaliation because of a good faith report of suspected misconduct. Please see the Brookdale Integrity Line section of this Code for more details on reporting suspected misconduct.

\*      \*      \*

**Integrity of Records, Statements**
**and Reports, and Compliance with Accounting Procedures**
Each associate should do his or her part to ensure that Brookdale's books of account and financial records meet applicable standards of accuracy and completeness. If

an associate has reason to believe that any of Brookdale's books and records are not being maintained in an accurate or complete manner, the associate is expected to report this immediately to the head of Brookdale's Internal Audit Department.

*    *    *

**Protection and Proper Use of Company Assets**

Associates, officers and directors have a duty to protect Brookdale's assets and ensure their efficient use. Theft, carelessness and waste have a direct impact on Brookdale's profitability. We should take measures to prevent damage to and theft or misuse of Brookdale property. When you leave the Company, all Brookdale property must be returned to the Company. Except as specifically authorized, all Brookdale assets, including Company time, funds, equipment, materials, resources and proprietary information, must be used for legitimate business purposes only.

**<u>Brookdale's Code of Ethics for Chief Executive and Senior Financial Officers</u>**

96.     The Code of Conduct references the Company's Code of Ethics for Chief Executive and Senior Financial Officers (the "Code of Ethics"), states that the Company is "committed to conducting [its] business in accordance with applicable laws, rules and regulations and the highest standards of business ethics, and to full and accurate financial disclosure in compliance with applicable law."

97.     The Code of Ethics states the following, in pertinent part:

As a Senior Officer, you must not only comply with applicable law. You also must engage in and promote honest and ethical conduct and abide by the Code of Business Conduct and Ethics and other Corporation policies and procedures that govern the conduct of our business. Your leadership responsibilities include creating a culture of high ethical standards and commitment to compliance, maintaining a work environment that encourages employees to raise concerns, and promptly addressing employee compliance concerns.

98.     In the section titled, "Compliance With Law, Rules And Regulations," the Code of Ethics states, in pertinent part, that, "[y]ou are required to comply with the laws, rules and regulations that govern the conduct of our business[.]"

99.     In the section titled "Conflicts of Interest," the Code of Ethics states, in pertinent part, that:

A conflict of interest occurs when your private interests interfere in any way, or even appear to interfere, with the interests of the Corporation. Your obligation to conduct the Corporation's business in an honest and ethical manner includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships.

100.     In the section titled "Disclosures," the Code of Ethics states, in pertinent part, that:

It is Corporation policy to make full, fair, accurate, timely and understandable disclosure in compliance with all applicable laws and regulations in all reports and documents that the Corporation files with, or submits to, the Securities and Exchange Commission  and in all  other public communications made by  the Corporation. As a Senior Officer, you are required to promote compliance with this policy by all employees and to abide by Corporation standards, policies and procedures designed to promote compliance with this policy.

101.     The Individual Defendants violated the Code of Conduct and Code of Ethics by engaging in or permitting the Manipulation Scheme and to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, abuse of control, gross mismanagement, and violations of Sections 14(a), 10(b) and 20(a) of the Exchange Act, and failing to report the same, and for contribution under Sections 10(b) and 21D of the Exchange Act.

## SUBSTANTIVE ALLEGATIONS

### Background

102.     Brookdale is based in Brentwood, Tennessee and operates 743 senior living communities in 45 states through which the Company is able to serve approximately 65,000 residents as of February 1, 2020. Specifically, as of that date, the Company owned 356 communities, leased 307 communities, managed 77 communities on behalf of third parties, and managed three communities for which Brookdale has an equity interest. Brookdale claims this makes them the largest operator of senior living facilities in the United States, based on capacity. The Company's services extend to the operation and management of independent living, assisted

27

living, memory care, and continuing care retirement communities. The Company also offers a range of home health, hospice, and outpatient therapy services to more than 20,000 patients, as of February 1, 2020. The Company reported nearly $4.06 billion in revenue for fiscal year 2019.

103.     In 2005, Brookdale was incorporated in the state of Delaware. The Company was formed through a series of mergers which combined Brookdale Living Communities, Inc., which had been a private company since 1986, and Alterra Corporation, which had been a private company since 1981. Soon after, on November 22, 2005, the Company went public and the following year, on July 25, 2006, Brookdale commenced a series of acquisitions that would result in it becoming the nation's largest operator of senior living communities. Such acquisitions included that of American Retirement Corporation, Horizon Bay on September 1, 2011, and Emeritus Corporation on July 31, 2014, for $2.8 billion. As a result of its assent, the Company bound itself to massive debt and lease obligations that financed Brookdale's steadfast growth strategy.

104.     In order to secure the considerable financing and lease agreements necessary to fund Brookdale's growth strategy, as provided in the Company's annual reports filed with the SEC, Brookdale agreed to delineate profit and financial performance thresholds for Brookdale's facilities both separately and on a collective basis. As result, pursuant to the Company's debt and lease obligations, the Company was required to, among other things, "maintain or satisfy specified financial ratios and coverage tests, including prescribed net worth levels" and "maintain lease coverage ratios on a lease portfolio basis" and "maintain stockholders' equity or tangible net worth amounts." Further, regarding communities in which Brookdale manages, the Company would be terminated if it did "not satisfy certain designated performance thresholds." Moreover, the Company's mortgages and leases contained "cross-default and cross-collateralization" provisions,

28

so that a default by Brookdale related to one community could affect a significant number of the Company's communities and their corresponding financing agreements and leases. Also, certain debt obligations were secured by both "a mortgage on a community" and a "guaranty by [Brookdale][.]"

105.     Due to the above, to ensure that Brookdale would satisfy, among other things, the Company's financial performance thresholds and its other contractual obligations, and, in turn, to reduce the risk of defaulting on agreements concerning substantial segments of its community-portfolio, the Company closely supervised, carefully oversaw, diligently monitored, tightly controlled, and thoroughly scrutinized all facets of the Company's operations and management of its facilities and communities throughout the nation, including, and particularly, daily staffing—the Company's principal expenditure.

### The Individual Defendants Regulate Daily Staffing Needs

106.     The Individual Defendants utilize the Service Alignment Software – a staffing algorithm produced by computer software which Brookdale designed, developed, and controls – in order to oversee, manage, analyze, and, ultimately, dictate the Company's day-to-day staffing needs at each one of Brookdale's facilities around the country. The Service Alignment Software is only accessible to certain of the Company's high-level officers as it allows them to alter the Service Alignment Software or its data inputs, as described below.

107.     The Service Alignment Software was utilized by the Company to allocate the total amount of time necessary and therefore available for its staff to provide care to the residents of Brookdale's communities. Two core types of information are accounted for in the Service Alignment Software: (1) the necessary amount of time needed in order to complete certain day-to-day services, which the Company claims were determined by internal studies; and (2) systems and

a source code which "takes the results of the time studies, as well as the assessed needs of the residents and other parameters and factors" to determine the total amount of staffing hours the Company needed on a day-to-day basis. Through the use of the Service Alignment Software, the Individual Defendants were thus able to determine, in advance, the amount of staffing hours Brookdale needed in each of its facilities by predicting the total assessed care that needed to be provided by Brookdale staff to the Company's residents and applying the respective average time, which was purportedly determined through internal studies, the Company deemed necessary to provide care to the Company's residents.

108.    The Individual Defendants not only kept the details of its method confidential, but would not even provide its own facility-level employees, including the executive directors of each facility, with the information used to determine staffing needs, as further described below. Upper level corporate management were in complete control of daily staffing needs, requiring facility-level employees to obtain explicit written consent from such upper management in order to make any adjustments to daily staffing need.

109.    The Individual Defendants oversee, manage, analyze, and, ultimately, control the Company's operating budgets at each one of Brookdale's facilities around the country, including expense limits dedicated to staffing.

110.    Initially, the Company's financial planning and analysis team circulates a draft budget with approximate final estimates for each Brookdale facility in the nation. Then, certain facility-level employees at each facility, whom have "read access" to the document, have one week to review their draft budget and respond to the Company's Regional Vice President, Regional Director of Operations and the Company's financial planning and analysis team with comments and modification requests. Upon final approval of the annual budget, the Individual

Defendants caused the Company to strictly enforce those budgets, including maximum daily staffing expenses, without alteration by way of emails, telephone calls, conference calls, and meetings. The Individual Defendants regularly directed that facility-level employees: (1) strictly adhere to staffing budgets; (2) reduce staffing to eliminate budget variances; (3) adhere to savings commitments related to staffing; (4) "do a better job managing [the Company's] labor, as [staffing] is by far [Brookdale's] largest expense;" and (5) implement changes to cause staffing to remain under budget or were pressured to make cuts. Moreover, the Individual Defendants caused the Company to admonish facility-level employees by: (1) stating that everyone would be held accountable for labor control; (2) stating that the Company had a zero-tolerance policy related to staffing expenses coming in over budget; (3) emphatically accentuating the significance of controlling labor and eliminating overtime; and (4) stating that the Company had a zero-tolerance policy for "dropping the ball" on labor controls.

111.    Further, the Individual Defendants implemented a system in order to induce employees to keep staffing expenses low which attached lucrative bonus and incentive packages to achieving or surpassing certain financial performance targets.

112.    The Individual Defendants caused the Company to establish, employ, and impose far-reaching, "company-wide" and "standardized" policies and operations procedures related to, among other things, management, accounting, finance, marketing, risk management, employee training, marketing, hiring of personnel, compliance with laws, employee behavior, resident behavior, resident assessment and resident care at its facilities.[1] The Company's facility-level employees lack the authorization to amend the Company's comprehensive, company-wide policies.

---

[1]  Discussed in the Company's annual and quarterly reports as detailed herein.

113.     The Company's corporate officers based out of Brookdale's headquarters in Brentwood, Tennessee, direct, control, and coordinate the Company's services and overall business operations for its locations throughout the United States. Moreover, a majority of Brookdale's executive and administrative functions are located in Tennessee, the CEO and Chief Operating Officer, the Company's Secretary maintain their principal offices in Tennessee, all of Brookdale's Executive Vice Presidents are also located in Tennessee, final decisions regarding the company-wide issues relating to the operations of Brookdale facilities throughout the nation were made by corporate executives at the Company's headquarters in Tennessee.[2]

114.     The Company's centralized operation as a single enterprise is further evidenced by Brookdale's annual and quarterly reports that the Individual Defendants caused the Company to file with the SEC, as referenced in detail below. For example, the Company's annual report for the periods ended December 31, 2014, December 31, 2015, December 31, 2016, December 31, 2017, and December 31, 2018, state that "we have and will continue to consolidate corporate functions such as accounting, finance, human resources, legal, information technology and marketing."

115.     During the Relevant Period, the Individual Defendants engaged in and/or permitted the Manipulation Scheme. The Individual Defendants allowed multiple violations of

---

[2] *See Edwards v. Emeritus Corp.*, Case No. 2:16-CV-08191-BRO-JPR (C.D. Cal. 2016); Notice of Removal of Action to Federal Court, ECF No. 1 711; *Briones v. Brookdale Senior Living Inc.*, Case No. 2:16-CV-08789-FMO-SK (C.D. Cal. 2016); Notice of Removal of Action to Federal Court, ECF No. 1 721, Declaration of Liberty Stansbury, SVP Human Resources for Brookdale, ECF No. 73-8; *Therrien v. Brookdale Senior Living Inc.*, Case No. 2:13-CV-00933- GAF-DTB (C.D. Cal. 2013); Notice of Removal of Action to Federal Court, ECF No. 1 714, and Declaration of Chad White 772-4*; Rejuso v. Brookdale Senior Living, Inc.*, Case No. 2:17-CV-04647-DSF-KS (C.D. Cal. 2017); ECF No. 1, Declaration of Liberty Stansbury ECF No. 775-9; *Schrenk v. Brookdale Senior Living Inc.*, Case No. 5:18-CV-01270- SVW-SP (C.D. Cal. 2018); ECF No. 1, Declaration of Liberty Stansbury ECF No. 775-7; s*ee Llamas v. Brookdale Senior Living Inc.*, Case No. 8:14-CV-00223-JLS-AN (C.D. Cal. 2014); ECF No. 1, Declaration of Jack Leebron ECF No. 774-10.

Brookdale's corporate governance policies to occur that injured the Company. These violations included, but were not limited to, engaging in or allowing the Manipulation Scheme and engaging in or allowing widespread violations of the Company's Code of Conduct and, as a result, caused the Company to engage in the Manipulation Scheme by failing and allowing the Company to fail to take meaningful action in response to complaints from Brookdale's residents, families of residents, and even Brookdale's own staff regarding the aforementioned violations and to take wrongful action in response. The Manipulation Scheme resulted in a decline in the value of the Company.

116.    The Company's standard and uniform form Residency Agreements tout Brookdale's commitment to personalized care. To that end, Brookdale mandates that each of its facilities conduct what Brookdale refers to as a "Personal Service Assessment" (the "Personal Service Assessment") upon each resident, which assesses a resident's needs. Afterwards, according to the level of care required, residents are assigned to one of two "Care Groups": (1) Choice Personal Services—care includes services related to, among other things, medication, nutrition, dressing and grooming, showering, or bathing, bathroom assistance, escort and mobility and service coordination; or (2) Comprehensive Care Options—care includes services related to, among other things, chronic condition management, respiratory equipment, nebulizer, nutrition, dressing and grooming needs for residents who cannot stand upright, bathroom assistance needs for residents who are catheterized, incontinent or cannot stand upright, two person or mechanical lifts, cognitive and psychological needs caused by memory loss, cognitive impairment and dangerous behavior, reluctance to accept care, behavior management, wound care, smoking assistance, and pet care. Brookdale pledges in its form contract to re-assess residents' level of care needed on a regular basis to meet their needs.

117.     The Company breaks down each service need and ascribes a particular cost. From there, the Company ascribes to each of its residents a monthly "Personal Service Rate" which is paid in exchange for meeting the evaluated level of care and specific needs documented in the Personal Service Plan, which is made up of the "Basic Service Rate" and the lesser of: (1) the total cost for meeting each assessed need within each category; or (2) a "Predictable Maximum Total" the Company assigns to each Care Group. From time to time the Personal Service Rates for each resident are adjusted based on re-evaluations of residents' needs and updates to their Personal Service Plans. Pursuant to the standardized letters the Company sends to Brookdale residents who are subject to rate increases, increased staffing costs need to "take care of your senior living needs" are the main factor.

118.     Along with the misrepresentations regarding staffing and services given to its residents that are contained in the Company's standard and uniform form Residency Agreements, Brookdale's sales and marketing materials, for example, its website, brochures, and presentations that were used to induce residents to enter into those Residency Agreements tout those same or substantially similar misrepresentations.  For example, the Company's website[3] stated:

(a)     [W]e make every effort to ease your loved one into a comfortable and enjoyable lifestyle, ***offering individually tailored personal care options to perfectly suit their needs.***

(b)     Your health is our top priority, and we have programs in place to help you maintain and stay on top of your health. Here are some care services you'd likely find at our assisted living communities: A ***personalized service assessment and plan*** where we evaluate ***your individual needs and then create a custom care plan tailored to you.***

(c)     Brookdale will ***assess your needs*** and help you chose the **services you need**.

(d)     Our **trained caregivers provide attention and assistance** with medication support, bathing, dressing, cooking and other tasks **throughout the day**. Our staff will also coordinate services with outside healthcare providers and monitor

---

[3]  https://brookdale.com/en.html.

34

residents to ensure they are healthy. **So your loved one gets the care they need** while enjoying the quality of life they've earned.

(e) **Trained caregivers provide assisted living care by providing assistance** with medication management, activities of daily living, engaging programming, and coordination with outside healthcare providers.

(f) At an assisted living community, ***caring staff members* are available to help them accomplish these tasks**, making life a lot easier than if they were living alone. This service provides ***peace of mind*** for them, as well as you. There's no need to take a chance on their health and safety, because ***our team of medical professionals can lend the right level of support that they need throughout the day.***

(g) The Brookdale approach provides ***services that are tailored to each individual's unique needs***, a way of life created to enrich the lives of others – with compassion, respect, excellence and integrity. In this way, we can make daily life easier for our residents, by ***offering the desired service and care as their needs and preferences dictate***. By ***customizing personal care offerings for the individual***, we help to ease assisted living residents through lifestyle transitions that complement their vision for all the places they would still like their lives to go.

(h) At Brookdale, we are **committed to listening to your needs**, understanding the life you want for yourself or your loved one, and ***then partnering with you to customize a solution*** for all the places you still want your life to go.

(i) The first step towards determining the right senior living option is ***to understand you and your family's needs***.

(j) [W]e believe in delivering senior care that's ***tailored to you*** and your loved one ***based on those unique needs*** and desires. That's why we provide a variety of options. ***This personalized approach ensures that you*** and your family ***get exactly what you need....***

(k) [We] cannot provide ***exceptional care and service*** until we find out exactly what it is that your ***loved one needs.***

(l) ***We start with a detailed assessment,*** listing the specifics of your loved one's level of care.

(Emphasis added.)

119.     In addition, Brookdale's website advertised that the Company would "[r]ecognize and [i]ntegrate" the results of each resident's Personal Service Assessment by ensuring that Brookdale's "professional staff is trained to recognize the specific needs … of each individual"

and that a "continuous assessment process" "ensures" the Company would be able to meet its residents' care needs.

120.     Concurrently, other marketing materials distributed by the Company advertised that at Brookdale facilities:

> **Carefully selected and trained associates do more than assist with activities of daily living** such as dressing, bathing and dispensing of medications; **they implement custom care plans designed to meet the individual needs of each resident** … It all begins with a Personal Service Assessment. We take the time to listen to our residents so that **we understand how to establish clinical, dining and program support that works for them in a meaningful way**. We recognize their individual needs and preferences and respond to them accordingly.

(Emphasis added.)

121.     The Company's marketing materials also claimed that Brookdale:

> Provide[s] customized care solutions to meet residents' unique needs and complement their vision for all the places they would still like their lives to go. From our trained staff to our wide variety of amenities and activities, we strive to offer personalized care and exceptional service at competitive and affordable rates. **Fees for care and services are based on each resident's needs** and preferences, as determined by the Living Accommodation selected **and their Personal Service Plan.**
>
> *              *              *
>
> This provides customer value because **our residents only pay for what they need** and want.

(Emphasis added.)

122.     Presentations distributed by the Company through Brookdale's social media platforms provided similar messaging, including a video uploaded to YouTube on December 1, 2017, which touted the advantages Brookdale's staffing provided:

> We know it's hard to talk about the next chapter, so we make every effort to make it easy for you. We start by asking, what does compassion, excellence, respect and integrity mean to you? Well, it means everything to us here at Brookdale and we listen. Listening helps us answer any question or concerns you may have about senior living. Together, we team up and plan the best way for you to enjoy life. This trusted relationship is maintained in over 1000 communities nationwide so

you can live just about anywhere you want and have ***80,000 passionate associates ready to work for you***. They've made Brookdale the industry leader in dedicated senior care. Every day they'll connect with you in a personal way and make sure that you're engaged and included. I want you to know that Brookdale is more than a progressive community, we're a community with a vision. A vision that is continually improving senior care at all levels for you. I know that senior care decisions can be difficult which is why we're dedicated to making it easy for you....

### *The Individual Defendants Systematically Failed to Adequately Staff Brookdale's Facilities and Failed to Disclose and Actively Concealed the Same*

123.     The Individual Defendants, throughout the Relevant Period, caused the Company to systematically fail to provide the necessary staffing for Brookdale's facilities. Therefore, despite the representations described above, the Individual Defendants caused the Company to fail to meet its residents' needs as determined by the Personal Service Assessment and violate the Company's obligations under the Residency Agreements and also state adult care home rules and regulations.

124.     In particular, the Individual Defendants caused the Company to set staffing figures, such as the amount of time estimated to fulfill certain tasks and levels of care, greatly beneath the actual required duration as a means to avoid systemic defaults on the Company's massive debt and lease obligations, as outlined above. The collective amount of labor time necessary to provide the daily services for Brookdale's resident populations, as a result, surpassed the daily amount of staff time the Company allotted to its facilities. Further, as a means to ensure that staffing costs would not increase, the Individual Defendants caused the Company to implement tight-knit control over the facility staffing and adopt a policy that barred local facility-level employees, who had specific knowledge regarding the staffing demands necessary to meet daily care needs, from adjusting staffing or critical factors and data that was entered into the Company's Service Alignment Software (for example, task counts, task times, logic algorithms, and source code). In addition, the Company itself failed to appropriately adjust staffing despite the fact that the Individual Defendants knew Brookdale's staffing figures were inadequate to meet

residents' assessed care needs, Brookdale's contractual obligations, and to comply with adult care home laws, rules, and regulations.

125. The Manipulation Scheme put disabled, and/or vulnerable residents at unnecessary risk of actual service deprivations through extreme wait times for already paid service care needs. The Manipulation Scheme consequently violated state laws and regulations and exposed the Company to a substantially increased risk of litigation.

126. The Individual Defendants received, yet intentionally and knowingly refused to address, a wave of complaints in response to the Manipulation Scheme from Brookdale residents, the families of Brookdale residents, and even Brookdale's own staff. Further, the Individual Defendants continued to engage in or permit the Manipulation Scheme, failed to disclose the Manipulation Scheme, and actively concealed the Manipulation Scheme, so that it would not default on its massive debt and lease obligations. The Individual Defendants' continued engagement and permittance of the Manipulation Scheme is supported by numerous reports generated by the Company's own facilities, corporate audits of each facilities' performance, and internal emails and communications.

127. Throughout the Relevant Period, Brookdale failed to maintain control over its financial statements and operational statements. As a result of this conduct, the Company's financial reports throughout the Relevant Period are materially false and misleading.

128. On May 3, 2019, Meghan Bright, as curator of the estate of Leonard Foote and Jean Howard, by and through her son Gary Weir, as power of attorney, filed the Bright Action seeking, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to provide the necessary services to meet the needs of its residents populations. Bright Action, ECF No. 1 at 11.

38

129.     On April 24, 2020, George Gunza, by and through his sister Peggy Fisher, as power of attorney, filed a complaint, on behalf of a class of residents in the Company's North Carolina communities, against Brookdale, captioned *Gunza, et al. v. Brookdale Senior Living Inc.*, No. 3:20-cv-00353-WLC-BDH (M.D. Tenn. 2020) (the "Gunza Action") seeking substantially similar relief as sought in the Bright Action, including, *inter alia*, to recover damages resulting from Brookdale's "chronically understaffed" assisted living facilities that "routinely" failed to sufficiently service the needs of its resident populations. Gunza, ECF No. 1 at 12.  The court granted a joint motion to consolidate the Gunza Action with the Bright Action on June 23, 2020.

### THE INDIVIDUAL DEFENDANTS' FALSE AND MISLEADING STATEMENTS

#### *August 9, 2016 Form 10-Q*

130.     Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2016, on Form 10-Q (the "2Q16 10-Q") on August 9, 2016. Defendant Baier signed the 2Q16 10-Q, which contained Sarbanes-Oxley Act of 2002 ("SOX") certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.     Brookdale reported net losses of $35.45 million attributable to Company stockholders for the quarter, or $0.19 per diluted share, on total revenue of approximately $1.26 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $84.8 million attributable to the Company stockholders, or $0.46 per diluted share, on total revenue of approximately $1.24 billion.

132.     The 2Q16 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the second fiscal quarter:

Resident fee revenue increased $10.6 million, or 1.0%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 1.6% at the 933 communities we owned or leased during both full periods with a 3.0% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue).

133.    The 2Q16 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expenses" for the second fiscal quarter:

Facility operating expense decreased over the prior year period primarily due to the impact of disposition and lease termination activity since the beginning of the prior year period and a $13.7 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The decrease was partially offset by increases in salaries and wages due to wage rate increases.

134.    In addition, the 2Q16 10-Q reported, in pertinent part, the following regarding "General and Administrative Expense" for the second fiscal quarter:

General and administrative expense increased $1.2 million, or 1.3%, over the prior year period primarily as a result of an increase in salaries and wages due to wage rate and bonus accrual increases and an increase in non-cash stock-based compensation expense. The increase was partially offset by a decrease in integration, transaction, transaction-related and strategic project costs.

135.    The 2Q16 10-Q reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter:

Costs incurred on behalf of managed communities increased $6.7 million, or 3.7%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

136.    In addition the 2Q16 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2016, the Company had "the ability to serve approximately

107,000 residents." The 2Q16 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 2Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

137.    Regarding the Company's disclosure controls and procedures, the 2Q16 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2016, our disclosure controls and procedures were effective.***

(Emphasis added.)

138.    Regarding the Company's internal control over financial reporting, the 2Q16 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 3, 2016 Form 10-Q***

139.    Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2016, on Form 10-Q (the "3Q16 10-Q") on November 3, 2016. Defendant Baier signed the 2Q16 10-Q, which contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to

the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

140.     Brookdale reported net losses of $51.69 million attributable to Company stockholders for the quarter, or $0.28 per diluted share, on total revenue of approximately $1.25 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $68.22 million attributable to the Company stockholders, or $0.37 per diluted share, on total revenue of approximately $1.24 billion.

141.     The 3Q16 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the third fiscal quarter:

> Resident fee revenue increased $2.7 million, or 0.3%, over the prior year period primarily as a result of an increase in the average monthly revenue per unit compared to the prior year period. During the current period, revenues grew 2.0% at the 896 communities we owned or leased during both full periods with a 3.2% increase in the average monthly revenue per unit (excluding amortization of entrance fee revenue). The increase was partially offset by the impact of disposition activity since the beginning of the prior year period and a 110 basis point decrease in weighted average occupancy in the 896 communities we owned or leased during both full periods. The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, generated $15.1 million of revenue during the current year period compared to $31.5 million of revenue in the prior year period.

142.     The 3Q16 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expense" for the third fiscal quarter:

> Facility operating expense increased $4.5 million, or 0.6%, over the prior year period primarily due to the impact of increases in salaries and wages due to wage rate increases. This increase was partially offset by disposition activity, through sales and lease terminations, since the beginning of the prior year period and a $13.9 million decrease in insurance expense from changes in estimates due to general liability and professional liability and workers compensation claims experience. The 57 communities disposed of subsequent to the beginning of the prior year period, either through sales or lease terminations, incurred $13.0 million of facility operating expenses during the current year period compared to $26.8 million of facility operating expenses in the prior year period.

143.     The 3Q16 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expense" for the third fiscal quarter:

> General and administrative expense decreased $36.1 million, or 36.3%, over the prior year period primarily due to a $29.4 million decrease in integration, transaction, transaction-related and strategic project costs, a decrease in bonus expense and a decrease in stock-based compensation expense.

144.     The 3Q16 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter:

> Costs incurred on behalf of managed communities increased $3.7 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full periods.

145.     In addition the 3Q16 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2016, the Company had "the ability to serve approximately 105,000 residents." The 3Q16 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 3Q16 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

146.     Regarding the Company's disclosure controls and procedures, the 3Q16 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-

15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

147.    Regarding the Company's internal controls over financial reporting, the 3Q16 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***February 15, 2017 Form 10-K***

148.    The Company filed its annual report with the SEC on February 15, 2017, announcing its financial and operating results for the quarter and year ended December 31, 2016, on a Form 10-K (the "2016 10-K"). Defendants Baier, Smith, Bumstead, Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky signed the 2016 10-K, which contained certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and SOX signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

149.    Brookdale reported net losses of $404.4 million attributable to Company stockholders for the 2016 fiscal year, or $2.18 per diluted share, on total revenue of $4.98 billion. In comparison, for the previous year, the Company reported a net loss of approximately $457.5 million attributable to the Company stockholders, or $2.48 per diluted share, on total revenue of $4.96 billion.

150.     The 2016 10-K reported, in pertinent part, the following regarding "Resident

Fees" for the full fiscal year ended December 31, 2016:

> Resident fee revenue decreased $8.5 million, or (0.2)%, compared to the prior
> year primarily due to disposition activity, through sales and lease terminations,
> since the beginning of the prior year and a 130 basis point decrease in occupancy
> at the 876 communities we owned or leased during both full periods. The decrease
> in resident fees was partially offset by a 3.1% increase in RevPOR[4] at these
> communities compared to the prior year. Total RevPAR for the consolidated
> portfolio also increased by 3.0% compared to the prior year. The 81 communities
> disposed of subsequent to the beginning of the prior year generated $126.2 million
> of revenue during 2016 compared to $202.0 million of revenue in the prior
> year.

151.     The 2016 10-K reported, in pertinent part, the following regarding "Facility

Operating Expense" for the full fiscal year ended December 31, 2016:

> Facility operating expense increased $10.5 million, or 0.4%, over the prior year
> primarily due to a $46.5 million increase in salaries and wages due to wage rate
> increases at the 876 communities we owned or leased during both full periods and
> $18.4 million of expense increases for our ancillary services in connection with
> higher home health and hospice average daily census. This increase was partially
> offset by disposition activity, through sales and lease terminations, since the
> beginning of the prior year and a $35.4 million decrease in insurance expense
> from changes in estimates due to general liability and professional liability and
> workers compensation claims experience. The 81 communities disposed of
> subsequent to the beginning of the prior year, either through sales or lease
> terminations, incurred $99.6 million of facility operating expenses during 2016
> compared to $164.5 million of facility operating expenses in the prior year.

152.     The 2016 10-K reported, in pertinent part, the following regarding "General and

Administrative Expense" for the full fiscal year ended December 31, 2016:

> General and administrative expense decreased $57.2 million, or 15.4%, over the
> prior year primarily due to a $61.5 million decrease in integration, transaction-
> related and strategic project costs.

> *          *          *

> This decrease was partially offset by an increase in salaries and wages due to
> wage rate increases.

---

[4]  RevPAR means "average monthly senior housing resident fee revenues per available unit[.]"

153.    The 2016 10-K reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the full fiscal year ended December 31, 2016:

> Costs incurred on behalf of managed communities increased $14.3 million, or 2.0%, primarily due to additional costs incurred on behalf of managed communities resulting from increases in salaries and wages and other facility operating expenses at the communities operated in both full years.

154.    The 2016 10-K, like the 2Q16 10-Q and the 3Q16 10-Q touted the Company's supposedly first-rate services and facilities, stating, " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that the Company had "the ability to serve approximately 103,000 residents," as of December 31, 2016. In addition, the 2016 10-K stated that the Company offers it residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive home-like setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)." In sum, the 2016 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

155.    The 2016 10-K stated the following regarding "Operations," in pertinent part:

> *We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service. We have centralized accounting, finance and other operating functions in our support centers so that, consistent with our operating philosophy, community-based personnel can focus on resident care, family connections and efficient operations.* Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, energy and insurance, *implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations;* billing and collections; accounts payable; finance and accounting; *risk management; development of employee training materials and programs; marketing activities; the hiring and*

*training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]*

(Emphasis added.)

156.    Regarding "Community Staffing and Training," the 2016 10-K stated, in pertinent part:

> Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.
>
> *          *          *
>
> Depending upon the size of the community, each Executive Director is supported by a community staff member who is directly responsible for day-to-day care of the residents and either community staff or regional support to oversee the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, therapy services, activities, housekeeping, and engineering.
>
> We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

157.    Regarding "Quality Assurance," the 2016 10-K stated, in pertinent part:

> **We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis**. **These inspections cover** the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; **quality of resident care** (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; **observance of residents in their daily living activities**; **and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.**

(Emphasis added.)

158.    The "Risk Factors" section of the 2016 10-K utilized nonspecific, boilerplate language in regard to risks related to "[i]ncreases in the cost and availability of labor, including

increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, [which] would have an adverse effect on [the Company's] business, results of operations and cash flow." The 2016 10-K's risk warnings were broad catch-all clauses, which were not designed to disclose the Company's known risks regarding the Manipulation Scheme. In particular, the 2016 10-K stated, in relevant part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in

organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

159.     Regarding the Company's disclosure controls and procedures, the 2016 10-K stated, in pertinent part:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of disclosure controls and procedures were effective***.

(Emphasis added.)

160.     Regarding the Company's internal control over financial reporting, the 2016 10-K stated, in pertinent part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
> *            *            *
>
> ***Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016. Management reviewed the results of their assessment with our Audit Committee***.
>
> *            *            *
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

161.     In addition, the 2016 10-K utilized general statements about the risk of errors in the Company's financial reporting. The 2016 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

### *May 10, 2017 Form 10-Q*

162.     Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2017, on Form 10-Q (the "1Q17 10-Q") on May 10, 2017. Defendant Baier signed the 1Q17 10-Q, which contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

163.     Brookdale reported net losses of $126.3 million attributable to Company stockholders for the quarter, or $0.68 per diluted share, on total revenue of approximately $1.22 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $48.78 million attributable to the Company stockholders, or $0.26 per diluted share, on total revenue of approximately $1.26 billion.

164.     The 1Q17 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the first fiscal quarter:

> Resident fee revenue decreased $44.2 million, or 4.2%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 816 communities we owned or leased during both full periods. Additionally, Brookdale Ancillary Services segment revenue decreased $10.2 million, or 8.4%, primarily due to a decrease in outpatient therapy service volume. The 59 communities disposed of subsequent to the

beginning of the prior year period (excluding the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $0.7 million of revenue during the current year period compared to $43.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 2.0% increase in RevPOR at the 816 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period. Resident fee revenue for the three months ended March 31, 2017 includes $64.0 million of revenue for the 62 communities acquired by the Blackstone Venture.

165.    The 1Q17 10-Q also reported, in pertinent part, the following regarding "Facility

Operating Expense" for the first fiscal quarter:

Facility operating expense decreased $41.4 million, or 5.8%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 59 communities since the beginning of the prior year period, which incurred $1.3 million of facility operating expenses during the three months ended March 31, 2017 compared to $33.8 million of facility operating expenses in the three months ended March 31, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $11.3 million, or 10.5%, primarily due to a decrease in outpatient therapy services volume.

166.    The 1Q17 10-Q also reported, in pertinent part, the following regarding "General

and Administrative Expense" for the first fiscal quarter:

General and administrative expense decreased $27.1 million, or 29.2%, over the prior year period primarily due to a $19.0 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.2 million during the current period compared to $19.1 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by

capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended March 31, 2017.

167.    The 1Q17 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter:

> Costs incurred on behalf of managed communities decreased $1.3 million, or 0.7%, primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

168.    In addition the 1Q17 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of December 31, 2016, the Company had "the ability to serve approximately 105,000 residents." The 1Q17 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 1Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

169.    The "Risk Factors" section of the 1Q17 10-Q stated, "[t]here have been  no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

170.    Regarding the Company's disclosure controls and procedures, the 1Q17 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-

15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

171.     Regarding the Company's internal control over financial reporting, the 1Q17 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***August 8, 2017 Form 10-Q***

172.     Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2017, on Form 10-Q (the "2Q17 10-Q") on August 8, 2017. Defendant Baier signed the 2Q17 10-Q, which contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

173.     Brookdale reported net losses of $46.29 million attributable to Company stockholders for the quarter, or $0.25 per diluted share, on total revenue of approximately $1.19 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $33.45 million attributable to the Company stockholders, or $0.19 per diluted share, on total revenue of approximately $1.26 billion.

174.     The 2Q17 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the second fiscal quarter:

> Resident fee revenue decreased $120.5 million, or 11.4%, compared to the prior year period primarily due to disposition activity, through sales and lease

53

terminations, since the beginning of the prior year period. Weighted average occupancy decreased 150 basis points at the 818 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $13.1 million, or 10.7%, primarily due to decreases in volume for outpatient therapy services and home health services. The 130 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $6.3 million of revenue during the current year period compared to $116.2 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.8% increase in RevPOR at the 818 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 0.9% compared to the prior year period.

175.     The 2Q17 10-Q also reported, in pertinent part, the following regarding "Facility

Operating Expense" for the second fiscal quarter:

Facility operating expense decreased $50.7 million, or 7.3%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 130 communities since the beginning of the prior year period, which incurred $7.5 million of facility operating expenses during the three months ended June 30, 2017 compared to $88.5 million of facility operating expenses in the three months ended June 30, 2016. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $7.2 million, or 6.9%, primarily due to decreases in volume for outpatient therapy services and home health services. These decreases were partially offset by an $11.3 million increase in insurance expense related to positive changes in the three months ended June 30, 2016 to estimates in general liability and professional liability and workers compensation expenses and an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods.

176.     The 2Q17 10-Q also reported, in pertinent part, the following regarding "General

and Administrative Expense" for the second fiscal quarter:

General and administrative expense decreased $23.6 million, or 26.0%, over the prior year period primarily due to a $16.1 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.6 million during the current period compared to $16.7 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal

costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expense for the three months ended June 30, 2017.

177.    The 2Q17 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter:

Costs incurred on behalf of managed communities increased $43.9 million, or 23.6%, primarily due to our entry into management agreements with the Blackstone Venture.

178.    In addition the 2Q17 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2017, the Company had "the ability to serve approximately 102,000 residents." The 2Q17 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 2Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

179.     The "Risk Factors" section of the 2Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

180.     Regarding the Company's disclosure controls and procedures, the 2Q17 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2017, our disclosure controls and procedures were effective.***

(Emphasis added.)

181.     Regarding the Company's disclosure controls and procedures, the 2Q17 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 7, 2017 Form 10-Q***

182.     Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2017, on Form 10-Q (the "3Q17 10-Q") on November 7, 2017. Defendant Baier signed the 3Q17 10-Q, which contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

183.     Brookdale reported net losses of $413.89 million attributable to Company stockholders for the quarter, or $2.22 per diluted share, on total revenue of approximately $1.18

billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $51.69 million attributable to the Company stockholders, or $0.28 per diluted share, on total revenue of approximately $1.25 billion.

184.    The 3Q17 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the third fiscal quarter:

> Resident fee revenue decreased $119.9 million, or 11.5%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 160 basis points at the 809 communities we owned or leased during both full periods, primarily due to the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $6.7 million, or 5.7%, primarily due to a decrease in volume for outpatient therapy services and a decrease in reimbursement rates for home health services. The 136 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $4.0 million of revenue during the current year period compared to $115.1 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.4% increase in RevPOR at the 809 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 1.1% compared to the prior year period.

185.    The 3Q17 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expense" for the third fiscal quarter:

> Facility operating expense decreased $53.6 million, or 7.6%, over the prior year period. For the three months ended September 30, 2017, facility operating expense includes $5.3 million of costs related to our response to Hurricanes Harvey and Irma. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 136 communities since the beginning of the prior year period, which incurred $3.3 million of facility operating expenses during the current year period compared to $87.4 million of facility operating expenses in the prior year period. Additionally, Brookdale Ancillary Services segment facility operating expenses decreased $1.9 million, or 1.8%, primarily due to a decrease in volume for outpatient therapy services. These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full periods and an $8.1 million increase in insurance expense related to positive changes in the three months ended September 30, 2016 to estimates in general liability and professional liability and workers compensation expenses.

186.    The 3Q17 10-Q also reported, in pertinent part, the following regarding "General and Administrative Expense" for the third fiscal quarter:

> General and administrative expense increased $0.4 million, or 0.6%, over the prior year period primarily due to increased legal fees. This increase was partially offset by a $5.6 million decrease in integration, transaction-related and strategic project costs. Integration, transaction-related and strategic project costs were $0.8 million during the current period compared to $6.4 million in the prior year period. Integration costs for 2016 include transition costs associated with organizational restructuring (such as severance and retention payments and recruiting expenses), third party consulting expenses directly related to the integration of acquired communities (in areas such as cost savings and synergy realization, branding and technology and systems work), and internal costs such as training, travel and labor, reflecting time spent by Company personnel on integration activities and projects. Transaction-related costs for 2016 include third party costs directly related to acquisition and disposition activity, community financing and leasing activity and corporate capital structure assessment activities (including shareholder relations advisory matters), and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out project) and reducing costs and achieving synergies by capitalizing on scale.

187.    The 3Q17 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the third fiscal quarter:

> Costs incurred on behalf of managed communities increased $49.2 million, or 26.2%, primarily due to our entry into management agreements with the Blackstone Venture.

188.    In addition the 3Q17 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2017, the Company had "the ability to serve approximately 101,000 residents." The 3Q17 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living

(such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 3Q17 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

189.     The "Risk Factors" section of the 3Q17 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2016."

190.     Regarding the Company's disclosure controls and procedures, the 3Q17 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2017, our disclosure controls and procedures were effective***.

(Emphasis added.)

191.     Regarding the Company's internal control over financial reporting, the 3Q17 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2017 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### *February 22, 2018 Form 10-K*

192.     Brookdale filed its annual report for the fiscal quarter and year ended December 31, 2017, on Form 10-K (the "2017 10-K") on February 22, 2018. Defendants Baier, Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Seward, and Wielansky signed the 2017 10-K, which contained SOX certifications signed by Defendants Smith and Baier attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's

internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

193.     Brookdale reported net losses of $571.4 million attributable to Company stockholders for the quarter, or $3.07 per diluted share, on total revenue of approximately $4.75 billion. In comparison, for the previous year, the Company reported a net loss of approximately $404.4 million attributable to the Company stockholders, or $2.18 per diluted share, on total revenue of approximately $4.98 billion.

194.     The 2017 10-K also reported, in pertinent part, the following regarding "Resident Fees" for the full fiscal year:

> Resident fee revenue decreased $388.5 million, or 9.3%, compared to the prior year primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year. Weighted average occupancy decreased 130 basis points at the 766 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets.
>
> *          *          *
>
> The 165 communities disposed of subsequent to the beginning of the prior year (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $172.6 million of revenue during the current year period compared to $543.3 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 2.5% increase in RevPOR. Total RevPAR for the consolidated portfolio also increased by 1.6% compared to the prior year.

195.     The 2017 10-K also reported, in pertinent part, the following regarding "Facility Operating Expense" for the full fiscal year:

> Facility operating expense decreased $197.2 million, or 7.0%, over the prior year.
>
> *          *          *
>
> The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 165 communities since the beginning of the prior year period, which incurred $135.0 million of facility operating expenses

during the current year compared to $413.1 million of facility operating expenses in the prior year.

*        *        *

These decreases were partially offset by an increase in salaries and wages arising from wage rate increases at the communities we operated during both full years and a $23.3 million increase in insurance expense related to positive changes in the prior year to estimates in general liability and professional liability and workers compensation expenses.

196. The 2017 10-K also reported, in pertinent part, the following regarding "General and Administrative Expense" for the full fiscal year:

General and administrative expense decreased $58.0 million, or 18.5%, over the prior year primarily due to a $47.4 million decrease in integration, transaction-related and strategic project costs.

*        *        *

Strategic project costs for 2016 include costs associated with strategic projects related to refining our strategy, building out enterprise-wide capabilities (including EMR roll-out projects) and reducing costs and achieving synergies by capitalizing on scale. Additionally, a reduction in corporate associate headcount resulted in decreased salaries and wage expenses in the current year.

197. The 2017 10-K also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the full fiscal year:

Costs incurred on behalf of managed communities increased $153.5 million, or 20.8%, primarily due to our entry into management agreements with the Blackstone Venture.

198. In addition the 2017 10-K, like the 2016 10-K, advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of December 31, 2017, the Company had "the ability to serve approximately 101,000 residents." The 2017 10-K further stated that the

Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 2017 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

199.     Regarding the Company's "Operations," the 2017 10-K stated the following:

> *We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service*. Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections*. Our operating procedures include securing national vendor contracts to obtain lower pricing for certain services such as food, supplies and insurance, *implementing effective budgeting and financial controls at each community, and establishing standardized training and operations procedures. We have also established company-wide policies and procedures relating to, among other things: resident care*; *community design and community operations*; billing and collections; accounts payable; finance and accounting; *risk management; development of employee training materials and programs*; marketing activities; *the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements*[.]

(Emphasis added.)

200.     Regarding the Company's "Community Staffing and Training," the 2017 10-K stated the following:

> Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

> *     *     *

> Depending upon the size of the community, each Executive Director is supported by a community staff member (health and wellness director or nursing director) who is directly responsible for day-to-day care of residents and community marketing and sales staff with regional support to oversee the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

201.     Regarding the Company's "Quality Assurance," the 2017 10-K stated the following:

> ***We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections*** cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff*; **quality of resident care** (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular to monitor their perception of the quality of services provided to residents.***

(Emphasis added.)

202.     The "Risk Factors" section of the 2017 10-K utilized nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, would have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2017 10-K were generic catch-all clauses that were not tailored to reveal the known risks related to the Manipulation Scheme. Specifically, the 2017 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage

increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

203.    Regarding the Company's disclosure controls and procedures, the 2017 10-K stated, in pertinent part:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each at, as of December 31, 2016, our disclosure controls and procedures were effective***.

(Emphasis added.)

204.    Regarding the Company's internal control over financial reporting, the 2017 10-K stated, in pertinent part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control—Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

*        *        *

**Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2016. Management reviewed the results of their assessment with our Audit Committee.**

*        *        *

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2016 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

205.     Regarding the risk of errors in the Company's financial reporting, the 2017 10-K utilized general statements, including that, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

### May 8, 2018 Form 10-Q

206.     Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2018, on Form 10-Q (the "1Q18 10-Q") on May 8, 2018. Defendant Baier signed the 1Q18 10-Q, which contained SOX certifications signed by Defendant Baier and non-party, Interim CFO, Teresa F. Sparks ("Sparks") attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

207.    Brookdale reported net losses of $457.19 million attributable to Company stockholders for the quarter, or $2.45 per diluted share, on total revenue of approximately $1.19 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $126.30 million attributable to the Company stockholders, or $0.68 per diluted share, on total revenue of approximately $1.22 billion.

208.    The 1Q18 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the first fiscal quarter:

> Resident fee revenue decreased $110.7 million, or 10.9%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations, since the beginning of the prior year period. Weighted average occupancy decreased 130 basis points at the 769 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. Additionally, Brookdale Ancillary Services segment revenue decreased $1.5 million, or 1.3%, primarily due to a decline in volume for home health visits. The 111 communities disposed of subsequent to the beginning of the prior year period (including the 62 communities for which the financial results were deconsolidated from our financial statements prospectively upon formation of the Blackstone Venture on March 29, 2017) generated $2.2 million of revenue during the current year period compared to $107.6 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 1.0% increase in RevPOR at the 769 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.8% compared to the prior year period.

209.    The 1Q18 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expenses" for the first fiscal quarter:

> Facility operating expense decreased $42.2 million, or 6.3%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 111 communities since the beginning of the prior year period, which incurred $2.1 million of facility operating expenses during the current year period compared to $81.0 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in employee compensation costs at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. Additionally, insurance expense increased related to positive changes in the prior year period to estimates in general liability and professional liability and workers compensation expenses. Additionally, Brookdale Ancillary Services segment facility operating

expenses increased $5.9 million, or 6.1%, primarily due to an increase in salaries and wages for the expansion of our hospice services.

210.    The 1Q18 10-Q also reported, in pertinent part, the following regarding "General and Administrative Expense" for the first fiscal quarter:

> General and administrative expense increased $11.2 million, or 17.0%, over the prior year period primarily due to increased costs associated with organizational restructuring, including severance and retention costs related to our efforts to reduce general and administrative expense and senior leadership changes. During the current year period, general and administrative expense included severance costs and retention costs of $10.7 million and $1.7 million, respectively.

211.    The 1Q18 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter:

> Costs incurred on behalf of managed communities increased $78.3 million, or 42.6%, primarily due to our entry into management agreements with the Blackstone Venture.

212.    In addition the 1Q18 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of March 31, 2018, the Company had "the ability to serve approximately 99,000 residents." The 1Q18 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (ADL) (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 1Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

213.    The "Risk Factors" section of the 1Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

214.    Regarding the Company's disclosure controls and procedures, the 1Q18 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

215.    Regarding the Company's internal control over financial reporting, the 1Q18 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***August 7, 2018 Form 10-Q***

216.    Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2018, on Form 10-Q (the "2Q18 10-Q") on August 7, 2018. Defendant Baier signed the 2Q18 10-Q, which contained SOX certifications signed by Defendant Baier and non-party Sparks attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

217.    Brookdale reported net losses of $165.49 million attributable to Company stockholders for the quarter, or $0.88 per diluted share, on total revenue of approximately $1.16

billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $46.29 million attributable to the Company stockholders, or $0.25 per diluted share, on total revenue of approximately $1.19 billion.

218.    The 2Q18 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the second fiscal quarter:

> Resident fee revenue decreased $38.1 million, or 4.1%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 94 communities, since the beginning of the prior year period. Weighted average occupancy decreased 100 basis points at the 758 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. The communities disposed of subsequent to the beginning of the prior year period generated $50.0 million of revenue during the current year period compared to $94.5 million of revenue in the prior year period. The decrease in resident fee revenue was partially offset by a 0.9% increase in RevPOR at the 758 communities we owned or operated during both full periods compared to the prior year period. Total RevPAR for the consolidated portfolio also increased by 2.5% compared to the prior year period.

219.    The 2Q18 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expense" for the second fiscal quarter:

> Facility operating expense decreased $15.3 million, or 2.4%, over the prior year period. The decrease in facility operating expense is primarily due to disposition activity, through sales and lease terminations, of 94 communities since the beginning of the prior year period, which incurred $31.8 million of facility operating expenses during the current year period compared to $68.7 million of facility operating expenses in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period.

220.    The 2Q18 10-Q also reported, in pertinent part, the following regarding "General and Administrative Expenses" for the second fiscal quarter:

> General and administrative expense decreased $6.8 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year.

221.    The 2Q18 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the second fiscal quarter:

> Costs incurred on behalf of managed communities increased $12.2 million, or 5.3%, primarily due primarily due to the impact of the adoption of ASU 2014- 09, *Revenue from Contracts with Customers* on January 1, 2018 under the modified retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.3 million for the three months ended June 30, 2018, respectively.

222.    In addition the 2Q18 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2018, the Company had "the ability to serve approximately 95,000 residents." The 2Q18 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (ADL) such as eating, bathing, dressing, toileting and transferring/walking[.]" In sum, the 2Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

223.    The "Risk Factors" section of the 2Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

224.    Regarding the Company's disclosure controls and procedures, the 2Q18 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-

15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

225.      Regarding the Company's internal control over financial reporting, the 2Q18 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended June 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 6, 2018 Form 10-Q***

226.      Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2018, on Form 10-Q (the "3Q18 10-Q") on November 6, 2018. Defendant Swain signed the 3Q18 10-Q, which contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

227.      Brookdale reported net losses of $37.12 million attributable to Company stockholders for the quarter, or $0.20 per diluted share, on total revenue of approximately $1.12 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $413.89 million attributable to the Company stockholders, or $2.22 per diluted share, on total revenue of approximately $1.18 billion.

228.      The 3Q18 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the third fiscal quarter:

> Resident fee revenue decreased $82.7 million, or 9.0%, compared to the prior year period primarily due to disposition activity, through sales and lease terminations of 104 communities, since the beginning of the prior year period, which

generated $15.0 million of revenue during the current year period compared to $106.9 million of revenue in the prior year period. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. Weighted average occupancy decreased 90 basis points at the 714 communities we owned or leased during both full periods, which reflects the impact of new competition in our markets. RevPAR and RevPOR at the 714 communities we owned or leased during both full periods increased by 0.2% and 1.3%, respectively. Total RevPAR for the consolidated portfolio also increased by 4.0% compared to the prior year period primarily due to fewer weighted average units.

229.     The 3Q18 10-Q also reported, in pertinent part, the following regarding "Facility

Operating Expense" for the third fiscal quarter:

Facility operating expense decreased $43.6 million, or 6.7%, over the prior year period primarily due to disposition activity, through sales and lease terminations, of 104 communities since the beginning of the prior year period, which incurred $11.2 million of facility operating expense during the current year period compared to $75.6 million of facility operating expense in the prior year period. These decreases were partially offset by an increase in labor expense at the communities we operated during both full periods, reflecting the impact of our investment in salaries and benefits and a tight labor market during the current year period. We expect that our labor investments will continue into 2019. Facility operating expense included costs related to our responses to hurricanes of $1.5 million in the current year period and $5.4 million in the prior year period.

230.     The 3Q18 10-Q also reported, in pertinent part, the following regarding "General

and Administrative Expense" for the third fiscal quarter:

General and administrative expense decreased $6.5 million, or 10.1%, over the prior year period primarily due to a decrease in salaries and wages expense as a result of a reduction in corporate associate headcount in the current year. During the current year period, general and administrative expense included retention costs of $1.6 million.

231.     The 3Q18 10-Q also reported, in pertinent part, the following regarding "Costs

Incurred on Behalf of Managed Communities" for the third fiscal quarter:

Costs incurred on behalf of managed communities increased $24.4 million, or 10.3%, primarily due to our entry into interim management agreements with HCP and Welltower for communities for which our leases were terminated subsequent to the prior year period. Additionally, costs incurred on behalf of managed communities increased due to the impact of the adoption of ASU 2014-09, *Revenue from Contracts with Customers* on January 1, 2018 under the modified

retrospective approach. The impact to revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $11.2 million for the three months ended September 30, 2018.

232.     In addition, the 3Q18 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating "[t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2018, the Company had "the ability to serve approximately 102,000 residents." The 3Q18 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 3Q18 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

233.     The "Risk Factors" section of the 3Q18 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2017."

234.     Regarding the Company's disclosure controls and procedures, the 3Q18 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2018, our disclosure controls and procedures were effective***.

(Emphasis added.)

235.     Regarding the Company's internal control over financial reporting, the 3Q18 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended September 30, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

### February 14, 2019 Form 10-K

236.     Brookdale filed its annual report for the fiscal year and quarter ended December 31, 2018, on Form 10-K (the "2018 10-K") on February 14, 2019. Defendants Baier, Swain, Bromley, Bumstead, Clegg, Johnson-Mills, Seward, Warren, and Wielansky signed the 2018 10-K, which contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

237.     Brookdale reported net losses of $528.3 million attributable to Company stockholders for the 2018 fiscal year, or $2.82 per diluted share, on total revenue of approximately $4.53 billion. In comparison, for the previous year, the Company reported a net loss of approximately $571.4 million attributable to the Company stockholders, or $3.07 per diluted share, on total revenue of approximately $4.75 billion.

238.     The 2018 10-K reported, in pertinent part, the following regarding "Resident Fees" for the full fiscal year:

> Resident fee revenue decreased $330.9 million, or 8.8%, compared to the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year.

\*          \*          \*

The decrease was partially offset by $32.3 million of revenue for four communities acquired during 2018. The increases to RevPAR and RevPOR for the consolidated portfolio are primarily due to the disposition of communities with lower RevPOR since the beginning of the prior year period. RevPOR at the 664 communities we owned or leased during both full years increased by 1.2%. Weighted average occupancy decreased 90 basis points at the 664 communities we owned or leased during both full years, which reflects the impact of new competition in our markets. RevPOR increased at communities that we owned or leased during both full years primarily as a result of in-place rent increases and lower discounting.

239.     The 2018 10-K reported, in pertinent part, the following regarding "Facility Operating Expense" for the full fiscal year:

> Facility operating expense decreased $148.8 million, or 5.7%, over the prior year primarily due to disposition activity through sales and lease terminations of 219 communities since the beginning of the prior year, which incurred $207.8 million of facility operating expense during 2018 compared to $453.4 million of facility operating expense in the prior year. The decrease was partially offset by an increase in labor expense at the communities we operated during both full years and by $17.9 million of facility operating expense for four communities acquired during 2018.

*          *          *

> Facility operating expense at the 664 communities we operated during both full years increased 4.6%, over the prior year, reflecting the impact of our investment in salaries and benefits and a tight labor market during 2018. We expect that our labor investments will continue into 2019. Additionally, costs for information technology systems and insurance expenses increased at the communities we operated during both full years.

240.     The 2018 10-K reported, in pertinent part, the following regarding "General and Administrative Expense" for the full fiscal year:

> General and administrative expense decreased $5.0 million, or 1.9%, over the prior year primarily due to a decrease in salaries and wages expense as a result of a reduction in our corporate associate headcount pursuant to the initiative to scale our general and administrative costs in connection with our portfolio optimization strategy. General and administrative expense included severance costs and retention costs of $12.3 million and $6.5 million, respectively, in 2018.

241.     The 2018 10-K reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the full fiscal year:

Costs incurred on behalf of managed communities increased $119.1 million, or 13.4%, primarily due to our entry into management agreements with the Blackstone Venture and the transition of communities previously leased from HCP and Welltower into the management services segment on an interim basis. Additionally, costs incurred on behalf of managed communities increased as a result of increases in salaries and wages and other facility operating expense at the communities managed in both full years and due to the impact of the adoption of ASU 2014-09, Revenue from Contracts with Customers on January 1, 2018 under the modified retrospective approach. The impact to each of revenue for reimbursed costs incurred on behalf of managed communities and reimbursed costs incurred on behalf of managed communities as a result of applying ASC 606 was an increase of $46.1 million for 2018.

242.    In addition the 2018 10-K advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of December 31, 2018, the Company had "the ability to serve approximately 102,000 residents." The 2018 10-K further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 2018 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

243.    The 2018 10-K reported, in pertinent part, the following regarding "Operations" for the full fiscal year:

> *We have implemented intensive standards, policies and procedures and systems, including detailed staff manuals and training materials, which we believe have contributed to high levels of customer service.* Further, we believe our centralized support infrastructure allows our community-based leaders and personnel *to focus on resident care and family connections.*
>
> We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional

operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining and procurement. ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and accounting; risk management; ***development of employee training materials and programs***; marketing activities; ***the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements***[.]

(Emphasis added.)

244.    The 2018 10-K reported, in pertinent part, the following regarding "Community Staffing and Training" for the full fiscal year:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services and financial performance.

*          *          *

Depending upon the size of the community, each Executive Director is supported by key leaders, a Health and Wellness Director (or nursing director) and/or a Sales Director. The Health and Wellness Director or nursing director is directly responsible for day-to-day care of residents. The Sales Director oversees the community's sales, marketing and community outreach programs. Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance.

We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

245.    The 2018 10-K reported, in pertinent part, the following regarding "Quality Assurance" for the full fiscal year:

***We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction with the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis.***

> ***These inspections*** cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; ***quality of resident care*** (including assisted living services, nursing care, therapy and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services provided to residents.***

(Emphasis added.)

246.    The "Risk Factors" section of the 2018 10-K utilized nonspecific, boilerplate language regarding risks related to "[i]ncreases in the cost and availability of labor, including increased competition for or a shortage of skilled personnel, increased wage pressures or increased union activity, would have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2018 10-K were generic catch-all clauses that were not tailored to reveal the known risks related to the Manipulation Scheme. Specifically, the 2018 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract skilled management personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for or a shortage of nurses, therapists or other trained personnel, or general inflationary pressures may require that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase to the salary thresholds for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset such added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates and the magnitude of the shortage of nurses, therapists or other trained personnel varies

substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified

and skilled personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the

Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions

to unionize any of [Brookdale's] community personnel could divert management attention, lead to

increases in [the Company's] labor costs and/or reduce [its] flexibility with respect to certain

workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if

onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale]

otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of

operations and cash flow would be negatively affected."

247.    Regarding the Company's disclosure controls and procedures, the 2018 10-K

stated, in pertinent part:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2018, disclosure controls and procedures were effective***.

(Emphasis added.)

248.    Regarding the Company's internal controls over financial reporting, the 2018 10-

K stated, in pertinent part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

\*        \*        \*

> ***Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2018. Management reviewed the results of their assessment with our Audit Committee***.

*       *       *

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2018 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

(Emphasis added.)

249.     The 2018 10-K also contained general statements about the risk of errors in the Company's financial reporting. To this point, the 2018 10-K stated, "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

### May 7, 2019 Form 10-Q

250.     Brookdale filed its quarterly report for the fiscal quarter ended March 31, 2019, on Form 10-Q (the "1Q19 10-Q") on May 7, 2019. Defendant Swain signed the 1Q19 10-Q, which contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

251.     Brookdale reported net losses of $42.60 million attributable to Company stockholders for the quarter, or $0.23 per diluted share, on total revenue of approximately $1.04 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $457.19 million attributable to the Company stockholders, or $2.45 per diluted share, on total revenue of approximately $1.19 billion.

252.     The 1Q19 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the first fiscal quarter:

> The decrease in total revenue was primarily attributable to the disposition of 118 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which had $119.9 million less in resident fees during the three months ended March 31, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.6% increase in same community RevPAR at the 658 communities we owned or leased during both full periods, comprised of a 3.1% increase in same community RevPOR and a 120 basis point decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $48.4 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

253.     The 1Q19 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expense" for the first fiscal quarter:

> The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which had $80.7 million less in facility operating expense during the three months ended March 31, 2019 compared to the prior year period. The decrease was partially offset by a 4.4% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from wage rate increases.

254.     The 1Q19 10-Q also reported, in pertinent part, the following regarding "General and Administrative Expense" for the first fiscal quarter:

> The decrease in general and administrative expense was primarily attributable to a decrease in organizational restructuring costs and salaries and wages expense as a result of a reduction in our corporate associate headcount since the beginning of the prior year period as we scaled our general and administrative costs in connection with community dispositions. Transaction and organizational restructuring costs decreased $16.7 million compared to the prior period, to $0.5 million for the three months ended March 31, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs.

255.    The 1Q19 10-Q also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the first fiscal quarter:

> The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

256.    In addition the 1Q19 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of March 31, 2019, the Company had "the ability to serve approximately 80,000 residents." The 1Q19 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 1Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

257.    The "Risk Factors" section of the 1Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

258.    Regarding the Company's disclosure controls and procedures, the 1Q19 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of March 31, 2019, our disclosure controls and procedures were effective***.

(Emphasis added.)

259.     Regarding the Company's internal control over financial reporting, the 1Q19 10-Q stated, in pertinent part:

> During the quarter ended March 31, 2019, the Company adopted the new lease standard (ASC 842). The Company updated its lease policies and implemented new processes, which changed the Company's internal controls over financial reporting for leases and related disclosures for our current period reporting. There were no other changes in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended March 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***August 6, 2019 Form 10-Q***

260.     Brookdale filed its quarterly report for the fiscal quarter ended June 30, 2019, on Form 10-Q (the "2Q19 10-Q") on August 6, 2019.  defendant Swain signed the 2Q19 10-Q, which contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

261.     Brookdale reported net losses of $55.47 million attributable to Company stockholders for the quarter, or $0.30 per diluted share, on total revenue of approximately $1.02 billion. In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $165.49 million attributable to the Company stockholders, or $0.88 per diluted share, on total revenue of approximately $1.16 billion.

262.     The 2Q19 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the second fiscal quarter:

> The decrease in total revenue was primarily attributable to the disposition of 124 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $117.4 million less in resident fees during the three months ended June 30, 2019 compared to the prior year period.

The decrease in resident fees was partially offset by a 1.9% increase in same community RevPAR at the 650 communities we owned or leased during both full periods, comprised of a 3.3% increase in same community RevPOR and a 110 basis points decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $41.6 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

263.     The 2Q19 10-Q also reported, in pertinent part, the following regarding "Facility Operating Expense" for the second fiscal quarter:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year period, which resulted in $80.2 million less in facility operating expense during the three months ended June 30, 2019 compared to the prior year period. The decrease was partially offset by a 5.5% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases and increased use of overtime.

264.     The 2Q19 10-Q also reported, in pertinent part, the following regarding "General and Administrative Expense" for the second fiscal quarter:

The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs. Transaction and organizational restructuring costs decreased $4.4 million compared to the prior period, to $0.6 million for the three months ended June 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing, and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the remainder of 2019 we expect to incur additional transaction costs related to stockholder relations advisory matters.

265.     The 2Q19 10-Q also reported, in pertinent part, the following regarding "General and Administrative Expense" for the second fiscal quarter:

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

266.     In addition the 2Q19 10-Q advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of June 30, 2019, the Company had "the ability to serve approximately 77,000 residents." The 2Q19 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 2Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

267.     The "Risk Factors" section of the 2Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

268.     Regarding the Company's disclosure controls and procedures, the 2Q19 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of June 30, 2019, our disclosure controls and procedures were effective***.

(Emphasis added.)

269.     Regarding the Company's internal control over financial reporting, the 2Q19 10-Q stated, in pertinent part:

There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended June 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

***November 5, 2019 Form 10-Q and Earnings Call***

270.     Brookdale filed its quarterly report for the fiscal quarter ended September 30, 2019, on Form 10-Q (the "3Q19 10-Q") on November 5, 2019. Defendant Swain signed the 3Q19 10-Q, which contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

271.     Brookdale reported net losses of $78.46 million attributable to Company stockholders for the quarter, or $0.42 per diluted share, on total revenue of approximately $1.01 billion.  In comparison, for the same quarter the previous year, the Company reported a net loss of approximately $37.12 million attributable to the Company stockholders, or $0.20 per diluted share, on total revenue of approximately $1.12 billion.

272.     The 3Q19 10-Q also reported, in pertinent part, the following regarding "Resident Fees" for the third fiscal quarter:

The decrease in total revenue was primarily attributable to the disposition of 77 communities through sales of owned communities and lease terminations since the beginning of the prior year period, which resulted in $63.9 million less in resident fees during the three months ended September 30, 2019 compared to the prior year period. The decrease in resident fees was partially offset by a 1.8% increase in same community RevPAR, comprised of a 2.8% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy. Additionally, management services revenue, including management fees and reimbursed costs incurred on behalf of managed communities, decreased $72.2 million primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

273.    The 3Q19 10-Q also reported, in pertinent part, the following regarding "Facility

Operating Expense" for the third fiscal quarter:

> The increase in facility operating expense was primarily attributable to a 7.0% increase in same community facility operating expense, which was primarily due to an increase in labor expense attributable to wage rate increases, an increase in employee benefit expense, and an increase in advertising, property remediation, and insurance costs during the period. The increase was partially offset by the disposition of communities since the beginning of the prior year period, which resulted in $47.5 million less in facility operating expense during the three months ended September 30, 2019 compared to the prior year period.

274.    The 3Q19 10-Q also reported, in pertinent part, the following regarding "General

and Administrative Expense" for the third fiscal quarter:

> The decrease in general and administrative expense was primarily attributable to a reduction in our corporate headcount, as we scaled our general and administrative costs in connection with community dispositions. The decrease was partially offset by a $0.7 million increase in transactional and organizational restructuring costs compared to the prior period, to $3.9 million for the three months ended September 30, 2019. The increase was due to $3.4 of transaction costs related to stockholder relations advisory matters incurred during the three months ended September 30, 2019. Transaction costs include those directly related to acquisition, disposition, financing and leasing activity, our assessment of options and alternatives to enhance stockholder value, and stockholder relations advisory matters, and are primarily comprised of legal, finance, consulting, professional fees and other third party costs. Organizational restructuring costs include those related to our efforts to reduce general and administrative expense and our senior leadership changes, including severance and retention costs. For the full year 2019, we expect transaction costs related to stockholder relations advisory matters to be approximately $5.5 million, of which $3.4 million was incurred for the three months ended September 30, 2019.

275.    The 3Q19 10-Q also reported, in pertinent part, the following regarding "Costs

Incurred on Behalf of Managed Communities" for the third fiscal quarter:

> The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

276.    In addition the 3Q19 10-Q advertised the Company's purportedly excellent senior

living communities and the services they could provide to customers, stating " [t]he Company is

committed to providing senior living solutions primarily within properties that are designed, purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of September 30, 2019, the Company had "the ability to serve approximately 75,000 residents." The 3Q19 10-Q further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 3Q19 10-Q asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

277.    The "Risk Factors" section of the 3Q19 10-Q stated, "[t]here have been no material changes to the risk factors set forth in Part I, Item 1A of our Annual Report on Form 10-K for the year ended December 31, 2018."

278.    Regarding the Company's disclosure controls and procedures, the 3Q19 10-Q stated, in pertinent part:

> Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures (as such term is defined under Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) as of the end of the period covered by this report. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of September 30, 2019, our disclosure controls and procedures were effective***.

(Emphasis added.)

279.    Regarding the Company's internal control over financial reporting, the 3Q19 10-Q stated, in pertinent part:

> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the quarter ended September 30, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

280.     On November 5, 2019, the Company also held an earning call addressing Brookdale's financial and operating results for the fiscal quarter ended September 30, 2019. During the call, Defendant Baier stated the following in response to a question from an analyst related to "wage pressures," in relevant part:

> Now turning your first question of what do we -- what are we doing to deal with the wage pressures. However, the first and most important thing is a true focus on controlling overtime and contract labor. Now we have to get to the root cause of what drove this up and in 2019, and in Q3 in particular. One of the things that we've seen is it's the tightest labor market in the last 50 years. ***And so making sure that we've got a propriate staff in our communities is the most important*** thing that we can do.

(Emphasis added.)

### *February 19, 2020 Form 10-K*

281.     Brookdale filed its annual report with the SEC for the quarter and fiscal year ended December 31, 2019, on Form 10-K (the "2019 10-K") on February 19, 2020. Defendants Baier, Swain, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky, and non-party Freed signed the 2019 10-K, which contained SOX certifications signed by Defendants Baier and Swain attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

282.     Brookdale reported net losses of $268.5 million attributable to Company stockholders for the year, or $1.44 per diluted share, on total revenue of approximately $4.06 billion. In comparison, for the previous year, the Company reported a net loss of approximately $528.3 million attributable to the Company stockholders, or $2.82 per diluted share, on total revenue of approximately $4.53 billion.

283.     The 2019 10-K also reported, in pertinent part, the following regarding "Resident Fees" for the full fiscal year:

The decrease in total revenue was primarily attributable to the disposition of 135 communities through sales of owned communities and lease terminations since the beginning of the prior year, which resulted in $336.5 million less in resident fees during the year ended December 31, 2019 compared to the prior year.

*      *      *

The decrease in total revenue was partially offset by a 1.9% increase in same community resident fee revenue and RevPAR, resulting from a 2.9% increase in same community RevPOR and an 80 basis points decrease in same community weighted average occupancy.

284.     The 2019 10-K also reported, in pertinent part, the following regarding "Facility Operating Expenses" for the full fiscal year:

The decrease in facility operating expense was primarily attributable to the disposition of communities since the beginning of the prior year, which resulted in $234.2 million less in facility operating expense during the year ended December 31, 2019. The decrease was partially offset by a 5.1% increase in same community facility operating expense, which was primarily due to an increase in labor expense arising from planned wage rate increases and an increase in employee benefit expense and increases in insurance and advertising costs compared to the prior year.

285.     The 2019 10-K also reported, in pertinent part, the following regarding "General and Administrative Expense" for the full fiscal year:

The decrease in general and administrative expense was primarily attributable to a decrease in transaction and organizational restructuring costs, a reduction in our corporate associate headcount since the beginning of the prior year as we scaled our general and administrative costs in connection with community dispositions, and lower professional fees.

286.     The 2019 10-K also reported, in pertinent part, the following regarding "Costs Incurred on Behalf of Managed Communities" for the full fiscal year:

The decrease in costs incurred on behalf of managed communities was primarily due to terminations of management agreements subsequent to the beginning of the prior year period.

287.     In addition the 2019 10-K advertised the Company's purportedly excellent senior living communities and the services they could provide to customers, stating " [t]he Company is committed to providing senior living solutions primarily within properties that are designed,

purpose-built and operated to provide the highest quality service, care and living accommodations for residents" and that as of February 1, 2020, the Company had "the ability to serve approximately 65,000 residents." The 2019 10-K further stated that the Company offers its residents "access to a full continuum of services across the most attractive sectors of the senior living industry" and "a supportive 'home-like' setting, assistance with activities of daily living (such as eating, bathing, dressing, toileting and transferring/walking)[.]" In sum, the 2019 10-K asserted that "[b]y providing residents with a range of service options as their needs change," the Company "provide[s] greater continuity of care."

288.    The "Operations" section of the 2019 10-K stated, in pertinent part:

> ***We have implemented intensive standards, policies and procedures, and systems, including detailed staff resources and training materials, which we believe have contributed to high levels of customer service.*** Further, we believe our centralized support infrastructure allows our community-based leaders and personnel ***to focus on resident care and family connections.***
>
> We have developed a centralized support infrastructure and services platform, which provides us with a significant operational advantage over local and regional operators of senior living communities. The size of our business also allows us to achieve increased efficiencies with respect to various corporate functions such as procurement, human resources, finance, accounting, legal, information technology, and marketing. We are also able to realize cost efficiencies in the purchasing of food, supplies, insurance, benefits, and other goods and services. In addition, we have established centralized operations groups to support all of our product lines and communities in areas such as training, regulatory affairs, asset management, dining, clinical services, sales, customer engagement, marketing, and procurement. ***We have also established company-wide policies and procedures relating to, among other things: resident care; community design and community operations***; billing and collections; accounts payable; finance and accounting; risk management; ***development of associate training materials and programs; advertising and marketing activities; the hiring and training of management and other community-based personnel; compliance with applicable local and state regulatory requirements[.]***

(Emphasis added.)

289.    The "Community Staffing and Training" section of the 2019 10-K stated, in pertinent part:

Each community has an Executive Director responsible for the overall day-to-day operations of the community, including quality of care and service, social services, and financial performance.

\*          \*          \*

Depending upon the size and type of the community, each Executive Director is supported by key leaders, a Health and Wellness Director (or nursing director), and/or a Sales Director. The Health and Wellness Director or nursing director is directly responsible for day-to-day care of residents. The Sales Director oversees the community's sales, marketing, and community outreach programs.

Other key positions supporting each community may include individuals responsible for food service, healthcare services, activities, housekeeping, and maintenance. We believe that quality of care and operating efficiency can be maximized by direct resident and staff contact.

290.    The "Quality Assurance" section of the 2019 10-K stated, in pertinent part:

***We maintain quality assurance programs at each of our communities through our corporate and regional staff. Our quality assurance programs are designed to achieve a high degree of resident and family member satisfaction through the care and services that we provide. Our quality control measures include, among other things, community inspections conducted by corporate staff on a regular basis. These inspections*** cover the appearance of the exterior and grounds; the appearance and cleanliness of the interior; the professionalism and friendliness of staff; ***quality of resident care*** (including assisted living services, nursing care, therapy, and home health programs); the quality of activities and the dining program; ***observance of residents in their daily living activities; and compliance with government regulations. Our quality control measures also include the survey of residents and family members on a regular basis to monitor their perception of the quality of services we provide to residents.***

(Emphasis added.)

291.    In the "Risk Factors," section the 2019 10-K contained general, theoretical, and boilerplate language regarding risks related to [i]ncreased competition for, or a shortage of, personnel, wage pressures resulting from increased competition, low unemployment levels, minimum wage increases, changes in overtime laws, and union activity may have an adverse effect on our business, results of operations and cash flow." The risk warnings contained in the 2019 10-K were generic catch-all provisions that were not fashioned to make public Brookdale's known

risks regarding the Manipulation Scheme. Specifically, the 2019 10-K stated, in pertinent part, that the Company's "success depends on [Brookdale's] ability to retain and attract qualified management and other personnel who are responsible for the day-to-day operations of each of [Brookdale's] communities"; that "[i]ncreased competition for, or a shortage of, nurses, therapists, or other personnel, low levels of unemployment, or general inflationary pressures have required and may require in the future that [the Company] enhance [Brookdale's] pay and benefits package to compete effectively for such personnel"; that Company has "experienced and may continue to experience wage pressures due to minimum wage increases mandated by state and local laws and the increase in the minimum salary threshold for overtime exemptions under the Fair Labor Standards Act"; that the Company "may not be able to offset the added costs resulting from competitive, inflationary or regulatory pressures by increasing the rates [the Company] charge[s] to [Brookdale's] residents or [Brookdale's] service charges, which would negatively impact [the Company's] results of operations and cash flow"; that "[t]urnover rates of our personnel and the magnitude of the shortage of nurses, therapists, or other personnel varies substantially from market to market"; that, "[i]f [the Company] fail[s] to attract and retain qualified personnel, [Brookdale's] ability to conduct [its] business operations effectively, [the Company's] overall operating results and cash flow could be harmed"; that "efforts by labor unions to unionize any of [Brookdale's] community personnel could divert management attention, lead to increases in [the Company's] labor costs, and/or reduce [its] flexibility with respect to certain workplace rules"; and that, "[i]f [the Company] experience[s] an increase in organizing activity, if onerous collective bargaining agreement terms are imposed upon [Brookdale], or if [Brookdale] otherwise experience[s] an increase in [its] staffing and labor costs, [the Company's] results of operations and cash flow would be negatively affected."

292.     Regarding the Company's disclosure controls, the 2019 10-K stated, in pertinent part:

> The Company maintains disclosure controls and procedures (as defined under Rules 13a-15(e) and 15d-15(e) of the Securities Exchange Act of 1934, as amended). Our management, under the supervision of and with the participation of our Chief Executive Officer and Chief Financial Officer, has evaluated the effectiveness of our disclosure controls and procedures. ***Based on such evaluation, our Chief Executive Officer and Chief Financial Officer each concluded that, as of December 31, 2019, our disclosure controls and procedures were effective.***

(Emphasis added.)

293.     Regarding the Company's disclosure controls, the 2019 10-K stated, in pertinent part:

> Our management is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Exchange Act Rule 13a-15(f). Under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, we conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control - Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).
>
> *            *            *
>
> ***Based on the Company's evaluation, management concluded that our internal control over financial reporting was effective as of December 31, 2019. Management reviewed the results of their assessment with our Audit Committee.***
>
> *            *            *
>
> There has not been any change in our internal control over financial reporting (as such term is defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act) during the fiscal quarter ended December 31, 2019 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

294.     In addition, the 2019 10-K utilized general statements about the risk of errors in the Company's financial reporting. Specifically, the 2019 10-K stated: "[b]ecause of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements.

Therefore, even those systems determined to be effective can only provide reasonable assurance with respect to financial statement preparation and presentation."

295.    The statements and omissions referenced in ¶¶ 130-294herein were materially false and misleading and failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants failed to disclose that: (1) the Manipulation Scheme; (2) the Company's commercial success was maintained by, among other things, the Manipulation Scheme; (3) the  Manipulation Scheme exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Manipulation Scheme would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and (5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

296.     On April 30, 2020, *Nashville Business Journal* published the April 2020 Article titled "Lawsuit accuses Brentwood health care giant of deception, understaffing" which reported on the Consumer Class Action filed against the Company alleging that the Company had intentionally "chronically" understaffed its facilities in North Carolina "in an effort to meet financial benchmarks" and, as a result, misled residents in North Carolina and their families when Brookdale had "promised basic care and daily living services." Further, the April 2020 Article revealed that the lawsuit claimed that the Company's residents in North Carolina "have not received the care and services they paid for" and seeks, *inter alia*, to enjoin the Company from engaging in "unlawful and fraudulent practices." The April 2020 Article also shed light on allegations regarding the Company's use of "computer software to 'underestimate' staffing needs at each of its facilities." The April 2020 Article further revealed that the Company's officers "routinely" scolded executive directors in emails related to staffing budgets. Finally, the April 2020 Article exposed that the Company had "created and implemented lucrative bonus and incentive programs tied to meeting or exceeding Brookdale's financial performance targets" to entice employees to "stay at or below Brookdale's limits for staffing and expenses."

297.     On this news, the Company's share price closed on May 1, 2020, at $3.12 per share, a $0.56 drop, or approximately 15.22%, from its closing price of $3.68 per share on April 29, 2020.

**Repurchases During the Relevant Period**

298.     Throughout the period in which the Company made false and/or misleading statements and omissions, the Individual Defendants caused the Company to initiate repurchases

of its common stock that substantially damaged the Company. During the Relevant Period the Company overpaid a total amount of nearly $41.1 million for repurchases of its own stock.

299.     Pursuant to the 3Q16 10-Q, during the three months of the Relevant Period ended September 30, 2016, the Individual Defendants caused the Company to repurchase 8,618 shares of its own common stock at an average price per share of approximately $17.36, for an aggregate cost to the Company of approximately $149,608.

300.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $14.24 more than the actual worth of each share during the three months of the Relevant Period ended September 30, 2016. Therefore, the Company overpaid a total of $122,720 for repurchases of its own stock during the three months of the Relevant Period ended September 30, 2016.

301.     Pursuant to the 2016 10-K, during the three months of the Relevant Period ended December 31, 2016, the Individual Defendants caused the Company to repurchase 767,711 shares of its own common stock at an average price per share of approximately $12.83, for an aggregate cost to the Company of approximately $9,849,732.

302.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $9.71 more than the actual worth of each share during the three months of the Relevant Period ended December 31, 2016. Therefore, the Company overpaid a total of $7,454,474 for repurchases of its own stock during the three months of the Relevant Period ended December 31, 2016.

303.     Pursuant to the 1Q17 10-Q, during the three months of the Relevant Period ended March 31, 2017, the Individual Defendants caused the Company to repurchase 349,420 shares of its own common stock at an average price per share of approximately $12.83, for an aggregate cost to the Company of approximately $5,112,015.

304.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $11.51 more than the actual worth of each share during the three months of the Relevant Period ended March 31, 2017. Therefore, the Company overpaid a total of $4,021,824 for repurchases of its own stock during the three months of the Relevant Period ended March 31, 2017.

305.     Pursuant to the 2Q17 10-Q, during the three months of the Relevant Period ended June 30, 2017, the Individual Defendants caused the Company to repurchase 14,833 shares of its own common stock at an average price per share of approximately $14.02, for an aggregate cost to the Company of approximately $207,959.

306.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $10.90 more than the actual worth of each share during the three months of the Relevant Period ended June 30, 2017. Therefore, the Company overpaid a total of $161,680 for repurchases of its own stock during the three months of the Relevant Period ended June 30, 2017.

307.     Pursuant to the 3Q17 10-Q, during the three months of the Relevant Period ended September 30, 2017, the Individual Defendants caused the Company to repurchase 29,092 shares

of its own common stock at an average price per share of approximately $11.97, for an aggregate cost to the Company of approximately $348,231.

308.    As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $8.85 more than the actual worth of each share during the three months of the Relevant Period ended September 30, 2017. Therefore, the Company overpaid a total of $257,464 for repurchases of its own stock during the three months of the Relevant Period ended September 30, 2017.

309.    Pursuant to the 2017 10-K, during the three months of the Relevant Period ended December 31, 2017, the Individual Defendants caused the Company to repurchase 24,238 shares of its own common stock at an average price per share of approximately $10.44, for an aggregate cost to the Company of approximately $253,045.

310.    As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $7.32 more than the actual worth of each share during the three months of the Relevant Period ended December 31, 2017. Therefore, the Company overpaid a total of $177,422 for repurchases of its own stock during the three months of the Relevant Period ended December 31, 2017.

311.    Pursuant to the 1Q18 10-Q, during the three months of the Relevant Period ended March 31, 2018, the Individual Defendants caused the Company to repurchase 384,788 shares of its own common stock at an average price per share of approximately $6.80, for an aggregate cost to the Company of approximately $2,616,558.

312.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.68 more than the actual worth of each share during the three months of the Relevant Period ended March 31, 2018. Therefore, the Company overpaid a total of $1,416,020 for repurchases of its own stock during the three months of the Relevant Period ended March 31, 2018.

313.     Pursuant to the 2Q18 10-Q, during the three months of the Relevant Period ended June 30, 2018, the Individual Defendants caused the Company to repurchase 12,685 shares of its own common stock at an average price per share of approximately $7.64, for an aggregate cost to the Company of approximately $96,913.

314.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $4.52 more than the actual worth of each share during the three months of the Relevant Period ended June 30, 2018. Therefore, the Company overpaid a total of $57,336 for repurchases of its own stock during the three months of the Relevant Period ended June 30, 2018.

315.     Pursuant to the 3Q18 10-Q, during the three months of the Relevant Period ended September 30, 2018, the Individual Defendants caused the Company to repurchase 15,777 shares of its own common stock at an average price per share of approximately $8.20, for an aggregate cost to the Company of approximately $129,371.

316.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.08 more than the actual worth of each share during the three months

of the Relevant Period ended September 30, 2018. Therefore, the Company overpaid a total of $80,147 for repurchases of its own stock during the three months of the Relevant Period ended September 30, 2018.

317.     Pursuant to the 2018 10-K, during the three months of the Relevant Period ended December 31, 2018, the Individual Defendants caused the Company to repurchase 1,310,052 shares of its own common stock at an average price per share of approximately $6.65, for an aggregate cost to the Company of approximately $8,711,846.

318.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.53 more than the actual worth of each share during the three months of the Relevant Period ended December 31, 2018. Therefore, the Company overpaid a total of $4,624,484 for repurchases of its own stock during the three months of the Relevant period ended December 31, 2018.

319.     Pursuant to the 1Q19 10-Q, during the three months of the Relevant Period ended March 31, 2019, the Individual Defendants caused the Company to repurchase 1,336,397 shares of its own common stock at an average price per share of approximately $6.58, for an aggregate cost to the Company of approximately $8,990,892.

320.     As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.46 more than the actual worth of each share during the three months of the Relevant Period ended March 31, 2019. Therefore, the Company overpaid a total of $4,727,734 for repurchases of its own stock during the three months of the Relevant Period ended March 31, 2019.

321.    Pursuant to the 2Q19 10-Q, during the three months of the Relevant Period ended June 30, 2019, the Individual Defendants caused the Company to repurchase 1,294,115 shares of its own common stock at an average price per share of approximately $6.39, for an aggregate cost to the Company of approximately $8,269,395.

322.    As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.27 more than the actual worth of each share during the three months of the Relevant Period ended June 30, 2019. Therefore, the Company overpaid a total of $4,231,756 for repurchases of its own stock during the three months of the Relevant period ended June 30, 2019.

323.    Pursuant to the 3Q19 10-Q, during the three months of the Relevant Period ended September 30, 2019, the Individual Defendants caused the Company to repurchase 16,631 shares of its own common stock at an average price per share of approximately $8.23, for an aggregate cost to the Company of approximately $136,873.

324.    As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $5.11 more than the actual worth of each share during the three months of the Relevant Period ended September 30, 2019. Therefore, the Company overpaid a total of $84,984 for repurchases of its own stock during the three months of the Relevant Period ended September 30, 2019.

325.    Pursuant to the 2019 10-K, during the three months of the Relevant Period ended December 31, 2019, the Individual Defendants caused the Company to repurchase 804,356 shares

of its own common stock at an average price per share of approximately $6.99, for an aggregate cost to the Company of approximately $5,622,448.

326. As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $3.87 more than the actual worth of each share during the three months of the Relevant Period ended December 31, 2019. Therefore, the Company overpaid a total of $3,112,858 for repurchases of its own stock during the three months of the Relevant Period ended December 31, 2019.

327. Pursuant to the Company's quarterly report for the fiscal quarter ended March 31, 2020, on Form 10-Q, during the three months of the Relevant Period ended March 31, 2020, the Individual Defendants caused the Company to repurchase 3,673,314 shares of its own common stock at an average price per share of approximately $5.99, for an aggregate cost to the Company of approximately $22,003,151.

328. As a result of the artificial inflation of the Company's common stock price due to the misrepresentations made by and/or caused to be made by the Individual Defendants, the Company paid on average $2.87 more than the actual worth of each share during the three months of the Relevant Period ended March 31, 2020. Therefore, the Company overpaid a total of $10,542,411 for repurchases of its own stock during the three months of the Relevant Period ended March 31, 2020.

## DAMAGES TO BROOKDALE

329. As a direct and proximate result of the Individual Defendants' conduct, Brookdale will lose and expend many millions of dollars.

330.     Such losses include the Company's overpayment by nearly $41.1 million for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

331.     Such expenditures include, but are not limited to, costs associated with the costs of legal fees associated with the Consumer Class Action filed against the Company and the Securities Class Action and other lawsuits filed against the Company, its CEO, former CEO, and CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

332.     Such expenditures include, but are not limited to, costs associated with the costs of defending investigations of the Manipulation Scheme and for fines paid in connection thereto.

333.     Additionally, these expenditures include, but are not limited to, lavish compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

334.     As a direct and proximate result of the Individual Defendants' conduct, Brookdale has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

335.     Plaintiffs bring this action derivatively and for the benefit of Brookdale to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of Brookdale, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, violations of Sections 14(a), 10(b), and 20(a) of the

Exchange Act, as well as the aiding and abetting thereof, and for contribution under Sections 10(b) and 21D of the Exchange Act.

336. Brookdale is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

337. Plaintiffs are, and have been at all relevant times, a Brookdale shareholder. Plaintiffs will adequately and fairly represent the interests of Brookdale in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

338. Plaintiffs incorporate by reference and re-allege each and every allegation stated above as if fully set forth herein.

339. A pre-suit demand on the Board of Brookdale is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following nine individuals: Defendants Baier, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky (the "Director Defendants"); and non-parties Freed and Jordan R. Asher (the "Non-Parties" and, together with the Director Defendants, the "Directors"). Plaintiffs need only to allege demand futility as to five of the nine Directors who were on the Board at the time this action was commenced.

340. Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while they caused the Company to repurchase its own stock at artificially inflated prices, which renders them unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

341.    Demand is also excused as to all of the Director Defendants because the Manipulation Scheme was an unlawful business strategy that the Company engaged in and was not a valid exercise of business judgment. As the ultimate decision-making body of the Company, the Board made and/or allowed the Company to engage in the schemes outlined herein.

342.    In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly participated in the conduct alleged herein. The fraudulent scheme was intended to make the Company appear more stable, profitable, and attractive to investors. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

343.    Demand is excused as to the Director Defendants because they breached their fiduciary duty to the Company—for which they face a substantial likelihood of liability—by causing the Company to pay Defendants Baier, Smith, and Swain their annual bonus and/or stock awards each year that they violated the Company's policies. Indeed, the Manipulation Scheme described herein could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct.

344.    Demand is also excused as to the Director Defendants because they were fully aware of the Manipulation Scheme during the Relevant Period, as evidenced by the fact that Brookdale's residents, families of residents, and even Brookdale's own staff inundated the Company with complaints of the chronic understaffing of Brookdale's facilities and, as a result of the Manipulation Scheme, the Company's failure to provide proper and promised care to the Company's residents. Nonetheless, the Director Defendants caused the Company to disseminate the false and misleading statements described herein, and, among other Individual Defendants, Defendants Bromley, Bumstead, and Wielansky caused Defendant Baier to be promoted to CEO

in February 2018. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

345.    Additional reasons that demand on Defendant Baier is futile follow. Defendant Baier has served as the Company's President and CEO and as a Company director since February 2018. Thus, as the Company admits, she is a non-independent director. The Company provides Defendant Baier with her principal occupation, and she receives handsome compensation, including $6,350,901 during the fiscal year ended December 31, 2019, $4,674,255 during the fiscal year ended December 31, 2018, $2,407,188 during the fiscal year ended December 31, 2017, and $2,492,367 during the fiscal year ended December 31, 2016. As the Company provides Defendant Baier with her primary occupation and means of livelihood, it is unlikely she would entertain a demand against the remaining current directors on the Board, who are responsible for, *inter alia*, determining her compensation and evaluating her continued employment with Brookdale. Defendant Baier was ultimately responsible for all of the false and misleading statements and omissions that were made, including those contained in the foregoing quarterly reports described herein filed on Forms 10-Q with the SEC as well as the 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K, which she signed and signed SOX certifications for. As the Company's highest officer and as a trusted Company director, she conducted little, if any, oversight of the Manipulation Scheme (which Defendant Baier engaged in and permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Moreover, Defendant Baier is a defendant in the Securities Class Action. For these reasons, too, Defendant Baier breached her

fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

346.    Additional reasons that demand on Defendant Bromley is futile follow. Defendant Bromley has served as a Company director since July 2017. He also serves as a member of the Audit Committee and as a member of the Investment Committee. Defendant Bromley has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Manipulation Scheme (which Defendant Bromley permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Bromley signed, and thus personally made the false and misleading statements in the 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Bromley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

347.    Additional reasons that demand on Defendant Bumstead is futile follow. Defendant Bumstead has served as a Company director since August 2006. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Defendant Bumstead has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the Manipulation Scheme (which Defendant Bumstead permitted despite being aware of it) and the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore,

Defendant Bumstead signed, and thus personally made the false and misleading statements in the 2016 10-K, 2017 10-K, 2018 10-K, and 2019 10-K. For these reasons, too, Defendant Bumstead breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

348.    Additional reasons that demand on Defendant Johnson-Mills is futile follow. Defendant Johnson-Mills has served as a Company director since August 2018. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Investment Committee. Defendant Johnson-Mills has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Manipulation Scheme (which Defendant Johnson-Mills permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Defendant Johnson-Mills signed, and thus personally made the false and misleading statements in the 2018 10-K and 2019 10-K. For these reasons, too, Defendant Johnson-Mills breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

349.    Additional reasons that demand on Defendant Sansone is futile follow. Defendant Sansone has served as a Company director since October 2019 and as Non-Executive Chairman of the Board since January 2020. Defendant Sansone has received and continues to receive compensation for his role as a director as described above. As a Company director he conducted little, if any, oversight of the  Manipulation Scheme (which Defendant Sansone permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Sansone signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, Defendant Sansone breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

350.   Additional reasons that demand on Defendant Warren is futile follow. Defendant Warren has served as a Company director since October 2018. She also serves as the Chair of the Audit Committee and as a member of the Compensation Committee. Defendant Warren has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Manipulation Scheme (which Defendant Warren permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Defendant Warren breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

351.   Additional reasons that demand on Defendant Wielansky is futile follow. Defendant Wielansky has served as a Company director since April 2015. He also serves as the Chair of the Investment Committee and as a member of the Audit Committee. Previously, he served as the Non-Executive Chairman of the Board from February 2018 until December 31, 2019. He also served as a member of the Compensation Committee. Defendant Wielansky has received and continues to receive compensation for his role as a director as described above. As a Company

director he conducted little, if any, oversight of the Manipulation Scheme (which Defendant Wielansky permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Defendant Wielansky breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

352.    Additional reasons that demand on non-party Freed is futile follow. Non-party Freed has served as a Company director since October 2019. She also serves as a member of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee. Freed has received and continues to receive compensation for her role as a director as described above. As a Company director she conducted little, if any, oversight of the Manipulation Scheme (which Freed permitted despite being aware of it) the Company's engagement in the scheme to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets. Furthermore, Freed signed, and thus personally made the false and misleading statements in the 2019 10-K. For these reasons, too, non-party Freed breached her fiduciary duties, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

353.    Additional reasons that demand on the Board is futile follow.

354.    Demand in this case is excused because the Director Defendants, all of whom are named as defendants in this action, and one of whom is a defendant in the Securities Class Action, control the Company and are beholden to each other. The Director Defendants have longstanding

business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, six of the eight Director Defendants have served on the Board for at least two years or more. These conflicts of interest precluded the Director Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director Defendants would be futile.

355.    In violation of the Audit Committee Charter, Defendants Bromley, Warren, and Wielansky failed to ensure that Brookdale's public disclosures were full and accurate and that the Company complied with all relevant laws and regulations. Thus, as members of the Audit Committee, they face a substantial likelihood of liability and demand is futile as to them.

356.    Additionally, each one of the Director Defendants, individually and collectively, faces a substantial likelihood of liability as a result of their intentional or reckless approval of the unnecessary and harmful repurchases that caused the Company to overpay by nearly $41.1 million for its own common stock during the period in which the false and misleading statements were made. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

357.    Brookdale has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Brookdale any part of the damages Brookdale suffered and will continue to suffer thereby. Thus, any demand on the Director Defendants would be futile.

358.     The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

359.     The acts complained of herein constitute violations of fiduciary duties owed by Brookdale's officers and directors, and these acts are incapable of ratification.

360.     The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of Brookdale. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Brookdale, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

361.     If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Brookdale to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

362.     Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, certainly at least five of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 10(b) and Rule 10b-5 of the Securities Exchange Act of 1934

363.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

364.     The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Brookdale. Not only is Brookdale now defending claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Brookdale by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase nearly 10.1 million of its own shares on the open market at artificially inflated prices, damaging Brookdale by nearly $41.1 million.

365.     During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify

the Company's press releases, public statements made in conference calls, and periodic and current reports filed with the SEC.

366.     The Individual Defendants employed devices, schemes and artifices to defraud while in possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Brookdale not misleading.

367.     The Individual Defendants, as top executives and directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as directors and officers of the Company, the Individual Defendants were able to and did control the conduct complained of herein and the content of the public statements disseminated by Brookdale. The Individual Defendants acted with scienter during the Relevant Period, in that they either had actual knowledge of the schemes and the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the schemes set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

368.     In addition to each of the Individual Defendants approving the issuance of the Company's false and misleading statements while they were serving as a senior executive and/or director of the Company, as members of the Board, each of the Individual Defendants then serving as a director and/or officer would have signed the Company's false and misleading Forms 10-K filed with the SEC during the Relevant Period, including Defendants Baier, Smith, Bumstead,

Clegg, Decker, Leeds, Parrell, Petty, Seward, and Wielansky who signed the 2016 10-K, Defendants Baier, Smith, Bromley, Bumstead, Clegg, Decker, Leeds, Seward, and Wielansky who signed the 2017 10-K, Defendants Baier, Swain, Bromley, Bumstead, Clegg, Johnson-Mills, Seward, Warren, and Wielansky who signed the 2018 10-K, Defendants Baier, Swain, Bromley, Bumstead, Johnson-Mills, Sansone, Warren, and Wielansky, and non-party Freed who signed the 2019 10-K.

369.    By virtue of the foregoing, the Individual Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

370.    Plaintiffs on behalf of Brookdale have no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Violations of Section 20(a) of the Securities Exchange Act of 1934

371.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

372.    The Individual Defendants, by virtue of their positions with Brookdale and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Brookdale and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of Section 20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Brookdale to engage in the illegal conduct and practices complained of herein.

373.    Plaintiffs, on behalf of Brookdale, have no adequate remedy at law.

## **THIRD CLIAM**

### **Against the Individual Defendants for Breach of Fiduciary Duties**

374.    Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

375.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Brookdale's business and affairs.

376.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

377.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Brookdale.

378.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

379.    In further breach of their fiduciary duties, the Individual Defendants either engaged in, or allowed the Company to engage in the Manipulation Scheme.

380.    Also in breach of their fiduciary duties owed to Brookdale, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and/or misleading statements and/or omissions of material fact to the investing public that failed to disclose, *inter alia*, that: (1) the Manipulation Scheme; (2) the Company's commercial success was maintained by, among other things, the Manipulation Scheme; (3) the  Manipulation Scheme exposed the Company to a greater chance of litigation and, in all likelihood, the uncovering of the Manipulation Scheme would have a substantial adverse effect on Brookdale's business, operations, prospects, and reputation; (4) consequently, Brookdale's financial performance was untenable; and

(5) Brookdale failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

381.    In further breach of their fiduciary duties owed to Brookdale, the Individual Defendants willfully or recklessly caused the Company to repurchase nearly $72.5 million worth of Company stock at artificially inflated prices.

382.    The Individual Defendants also breached their fiduciary duty to the Company by causing the Company to pay the Individual Defendants their annual bonuses and/or stock awards each year that they violated the Company's policies.

383.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Brookdale's securities.

384.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Brookdale's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

385.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

386.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Brookdale has sustained and continues to sustain significant damages. As a result of the Manipulation Scheme alleged herein, the Individual Defendants are liable to the Company.

387.     Plaintiffs on behalf of Brookdale have no adequate remedy at law.

### FOURTH CLAIM

**Against Individual Defendants for Unjust Enrichment**

388.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

389.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Brookdale.

390.     The Individual Defendants either benefitted financially from the improper conduct or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Brookdale that was tied to the performance or artificially inflated valuation of Brookdale, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

391.     Plaintiffs, as shareholders and representatives of Brookdale, seek restitution from the Individual Defendants and seek an order from this Court disgorging all profits, benefits, and other compensation, including from any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

392.     Plaintiff son behalf of Brookdale have no adequate remedy at law.

## FIFTH CLAIM

**Against Defendants Baier, Smith, and Swain for Contribution
Under Sections 10(b) and 21D of the Exchange Act**

393.     Plaintiffs incorporate by reference and re-allege each and every allegation set forth above, as though fully set forth herein.

394.     Brookdale, along with Defendants Baier, Smith, and Swain are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Baier, Smith, and Swain's willful and/or reckless violations of their obligations as officers and/or directors of Brookdale.

395.     Defendants Baier, Smith, and Swain, because of their positions of control and authority as officers and/or directors of Brookdale, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of Brookdale, including the wrongful acts complained of herein and in the Securities Class Action.

396.     Accordingly, Defendants Baier, Smith, and Swain are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

397.     As such, Brookdale is entitled to receive all appropriate contribution or indemnification from Defendants Baier, Smith, and Swain.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiffs demand judgement in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiffs may maintain this action on behalf of Brookdale, and that Plaintiffs are an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Brookdale;

(c)    Determining and awarding to Brookdale the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Brookdale and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Brookdale and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1.    a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2.    a provision to permit the shareholders of Brookdale to nominate at least five candidates for election to the Board;

3.    a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations; and

(e)    Awarding Brookdale restitution from Individual Defendants, and each of them;

(f)      Awarding Plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs hereby demand a trial by jury.

Dated: June 17, 2021

Respectfully Submitted,

*/s/ Blake A. Bennett*
**COOCH AND TAYLOR, P.A.**
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, Delaware 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorney for Plaintiff*

**OF COUNSEL**
**BRAGAR EAGEL & SQUIRE, P.C.**
Garam Choe
810 Seventh Avenue, Suite 620
New York, New York 10022
Telephone: (212) 355-4648